## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| P & G, LLC,<br>1613 16th Street, N.W.<br>Unit I<br>Washington, D.C. 20009<br><br>    and<br><br>FURIOSO DEVELOPMENT CORPORATION<br>1613 16th Street, N.W.<br>Unit I<br>Washington, D.C. 20009<br><br><br>    Plaintiffs,<br>        v.<br><br>CAMDEN SUMMIT PARTNERSHIP<br>3 Greenway Plaza, Suite 1300<br>Houston, TX 77046<br><br>    and<br><br>CAMDEN SUMMIT, INC.<br>3 Greenway Plaza, Suite 1300<br>Houston, TX 77046<br><br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### NOTICE OF REMOVAL

TO THE CLERK OF THE ABOVE ENTITLED COURT

        PLEASE TAKE NOTICE that Defendants, Camden Summit Partnership, L.P. and

Camden Summit, Inc, hereby removes this civil action pursuant to 28 U.S.C. §§ 1441 and 1446.

As grounds for removal, Defendants state as follows:

1.     This civil action was commenced in the Superior Court for the District of Columbia, Civil Division, entitled P & G, LLC and Furioso Development Corporation, Plaintiffs v. Camden Summit Partnership, L.P. and Camden Summit, Inc., Defendants.

2.     This Notice of Removal is filed subject to and with full reservation of rights by both Defendants, including but not limited to defenses and objections to venue, improper service of process, personal jurisdiction, and any others that each Defendant might pursue.

3.     This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(d).

4.     Written notice of the filing of this Notice of Removal has been provided to the plaintiffs and the courts by Defendants.  A copy of this Notice has been filed in the District of Columbia Superior Court, concurrent with this Notice, pursuant to 28 U.S.C. § 1446(d).

5.     This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, and this action may thus be removed to this Court by Defendants pursuant to 28 U.S.C. § 1441, because:

a.     As alleged in the complaint, Plaintiff P&G, L.L.C. is a limited liability company organized and existing under and by virtue of the laws of the District of Columbia.  Plaintiff Furioso Development Corporation is a corporation organized and existing under and by virtue of the laws of the District of Columbia.

b.     Upon information and belief, both Plaintiffs' principal place of business is located at 1613 16th Street, N.W., Unit I, Washington, D.C. 20009.

c.      Both Defendants are corporations organized and existing under and by virtue of the law of Delaware with their principal place of business located at 3 Greenway Plaza, Suite 1300, Houston, TX 77046.

d.      As alleged in the complaint, the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

6.      Pursuant to 28 U.S.C. § 1446(a), a party removing an action must file copies of all documents served on it in the action.  A true and correct copy of the complaint and summons is attached as Exhibit 1.  All other documents filed in this case are attached as Exhibit 2.  No answer or responsive pleading has been filed in the action by either Defendant.

WHEREFORE, Defendants provide notice that civil action 2007 CA 002922B now pending against them in the Superior Court of the District of Columbia is removed to the United States District Court for the District of Columbia.

Dated:  May 18, 2007                     Respectfully submitted,

Allen M. Gardner
LATHAM & WATKINS LLP
555 11th Street, N.W.
Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200
Fax: (202) 637-2201

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Allen Gardner, hereby certify that on the 18th day of May, 2007, a copy of the Notice

of Removal was sent, by overnight delivery to:

> David J. Frantz
> Conlon, Frantz, Phelan and Varma, LLP
> 1818 N. Street, N.W., Suite 400
> Washington, DC 20036

_____
                Allen M. Gardner

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| P&G, LLC and FURIOSO DEVELOPMENT CORPORATION | CAMDEN SUMMIT PARTNERSHIP, L.P. and CAMDEN SUMMIT, INC. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF      Houston (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) DAVID J. FRANTZ MICHAEL J. CONLON CONLON, FRANTZ, PHELAN & VARMA, LLP 1818 N STREET, N.W., SUITE 400 WASHINGTON, D.C. 20036 (202) 331-7050 | ATTORNEYS (IF KNOWN) ALLEN M. GARDNER LATHAM & WATKINS LLP 555 ELEVENTH ST., N.W., SUITE 1000 WASHINGTON, D.C. 20004 (202) 637-2270 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ● 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ● 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)      OR      ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ◉ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 997,541.60    Check YES only if demanded in complaint
JURY DEMAND:    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☐    If yes, please complete related case form.

DATE 5/18/07    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

P & G, LLC                                  :
1613 16th Street, N.W.                       :
Unit 1                                      :
Washington, D.C. 20009                      :
                                            :
        and                                 :
                                            :
Furioso Development Corporation             :
1613 16th Street, N.W.                       :
Unit 1                                      :
Washington, D.C. 20009                      :
                                            :
        Plaintiffs                          :
                                            :
        v.                                  :
                                            :
Camden Summit Partnership, L.P.             :
212 S. Tryon St., Suite 500                 :
Charlotte, NC 28281                         :
                                            :
        and                                 :
                                            :
Camden Summit, Inc.                         :
3 Greenway Plaza, Suite 1300                :
Houston, TX 77046                           :
                                            :
        Defendants                          :
                                            :
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

RECEIVED
Civil Clerk's Office
APR 2 5 2007
Superior Court of the
District of Columbia
Washington, D.C.

0002922-07

Civil Action No. _____

## **COMPLAINT**

The Plaintiffs, P & G, LLC and Furioso Development Corporation, for their Complaint

against the Defendants, Camden Summit Partnership, L.P. and Camden Summit, Inc., state as

follows:

1.      Jurisdiction of this Court is based upon D.C. Code § 11-921 (2006).

## TERMINATION AGREEMENT

THIS TERMINATION AGREEMENT (this "Agreement") made this 29th day of January, 2001, by and between SUMMIT PROPERTIES PARTNERSHIP, L.P., a Delaware limited partnership ("Summit") and P&G, LLC, a District of Columbia limited liability company ("P&G").

WHEREAS, P&G and Summit have previously entered in a letter agreement dated March 8, 2000 (the "Letter Agreement") and a Development and Assignment Agreement dated June 30, 2000 (the "June 30th Agreement") related to purchase and development of that certain parcel of land, improved by a multi-storied hotel/apartment building, located at 2101 – 16th Street, NW, Washington, D.C. and commonly known as "The Roosevelt" (the "Property"); and

WHEREAS, P&G and Summit have agreed to new terms with respect to the acquisition and development of the Property and intend to execute an agreement pursuant to which P&G will contribute its interest in its purchase contract with the owner of the Property to Summit as an equity contribution (the "Contribution Agreement") and an agreement relating to P&G's continued rights and obligations with respect to developing the Property (the "Development Agreement").

NOW, THEREFORE, in consideration of the execution of the Contribution Agreement and the Development Agreement by both parties, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, P&G and Summit agree as follows:

1.   Upon execution and delivery of the Contribution Agreement and the Development Agreement by both parties, the Letter Agreement and the June 30th Agreement shall be deemed terminated and void ab initro.

2.   This Agreement may be executed in counterparts and a facsimile of either party's signature shall be accepted as an original.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

SUMMIT:                                          P&G:

SUMMIT PROPERTIES                   P&G, LLC, a District of Columbia
PARTNERSHIP, L.P.                          limited liability company

By:   SUMMIT PROPERTIES, INC.     By: _____
       a Maryland corporation, its sole          Giorgio Furioso
       general partner                                    Managing Member

       By: _____
       Thomas A. Baum, Vice President



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7006 0810 0005 5427 0500

LAW OFFICES
CONLON, FRANTZ, PHELAN & VARMA , LLP
SUITE 400
1818 N STREET, N.W.
WASHINGTON, D.C. 20036

TO

CT Corporation System,
Registered Agent for Camden Summit Inc.
1025 Vermont Avenue, NW
Washington, DC 20005

*Certified Mail
Return Receipt Requested*

CONTRIBUTION AGREEMENT

*The Roosevelt*

THIS CONTRIBUTION AGREEMENT (this "Agreement") is made as of this 2⁹ᵗʰ day of January, 2001, by and between SUMMIT PROPERTIES PARTNERSHIP, L.P., a Delaware limited partnership ("Summit"), and P & G LLC, a District of Columbia limited liability company ("P & G") (Summit and P & G are sometimes individually referred to as a "Party" and collectively referred to as the "Parties").

*WHEREAS*, P & G and The District of Columbia Financial Responsibility and Management Assistance Authority ("Seller") have entered into an Agreement of Purchase and Sale, dated as of May 19, 2000 (the "Contract"), for the sale of that certain parcel of land, improved by a multi-storied hotel/apartment building, located at 2101 16ᵗʰ Street, N.W., Washington, D.C. and commonly known as "The Roosevelt" (the "Property"), which Property is more particularly described in Exhibit A attached hereto and incorporated herein by this reference. Summit desires to acquire the Property and develop the Property as residential apartments. P & G and Summit intend that P & G shall contribute the Contract to Summit for equity in Summit on the terms and conditions hereinafter set forth and further intend that the Property shall be developed by the Parties in accordance with a development agreement between them.

NOW, THEREFORE, in consideration of Ten and No/100 Dollars ($10.00), the mutual promises and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Assignment of Contract and Due Diligence Materials. By an assignment (the "Assignment"), a copy which is attached hereto as Exhibit B, P & G shall assign, and Summit shall assume, (i) all of P & G's interests, rights and obligations under the Contract and (ii) all of P & G's title to due diligence materials relating to the Property that were commissioned by P & G or are in the possession of P & G. Such assignment shall be deemed a contribution to the capital of Summit and given in return for the issuance of units in Summit as set forth below. Pursuant to the terms of this Agreement, the Assignment and the intention of the Parties, the assignments and assumptions described above are conditioned upon the obligation of Summit to close under the Contract. In the event that Summit shall fail to close then the assignments and assumptions shall be null and void.

2.    Issuance of Units.    The parties agree that the value of the Contract and the other materials being assigned to Summit is $1,900,000.00. Therefore, in consideration for the assignment of the Contract as capital to it, Summit shall issue to P & G 66,376 limited partnership units in Summit (the "Units") whose agreed upon value is $1,900,000.00. Said Units shall be issued as of January 29, 2001 and P & G shall be provided with evidence thereof within five (5) business days of the date of this Agreement.

3.    Nature of Units. The Units shall be equivalent in all respects to all other limited partnership units in Summit. The transfer and sale of the Units shall be restricted for such time as is provided in the Registration Rights and Lock-Up Agreement (the "Reg Rights Agreement") of even date herewith by and between Summit and P&G. Summit further agrees that after any restriction period the Units

may be redeemed by P&G at its option and no cost to it on a one for one basis for Registerable Shares (as defined in the Reg Rights Agreement) of common stock of Summit Properties, Inc.

4.    Notices.    Any notice, request, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be deemed to be delivered (a) upon receipt, if delivered by facsimile or if hand delivered, (b) on the first business day after having been delivered to a national overnight air courier service, or (c) three business days after deposit in registered or certified mail, return receipt requested, addressed as follows:

SUMMIT:

Summit Properties Partnership, L.P.
6500 Rock Spring Drive Suite 100
Bethesda, Maryland 20817
Attention: Thomas A. Baum
Telephone: (301) 530-8800
Facsimile: (301) 530-7636

with additional copies to:

David H. Jones, Esq.
Kennedy Covington Lobdell & Hickman, L.L.P.
Bank of America Corporate Center
100 N. Tryon Street, Suite 4200
Charlotte, North Carolina 28202
Telephone: (704) 331-7481
Facsimile: (704) 331-7598

P & G, LLC
c/o Furioso Development
1520 16th Street, NW, Unit 101,
Washington, DC 20036
Attention: Giorgio Furioso
Telephone: (202) 518-7888
Facsimile: (202) 518-7828

with additional copies to:

Michael J. Conlon, Esquire
Conlon, Frantz, Phelan & Pires, LLP
1818 N Street, NW, #700
Washington, DC 20036
Telephone: (202) 331-7050
Facsimile: (202) 331-9306

2

0123009.01
LJB:

5.    Assignment; Successors and Assigns.  This Agreement may be assigned, in whole or in part, by one party, only with the prior written consent of the other party (which consent shall not be unreasonably withheld), and shall be binding upon and shall inure to the benefit of any successors and assigns of the Parties.

6.    No Brokers.  The Parties each warrant and represent to each other that no realtor, broker, finder, or other intermediary has been involved with or employed by such party in connection with the transaction contemplated by this Agreement.  The Parties agree to indemnify, hold harmless and defend the other from and against claims, loss, liability, cost and expense (including reasonable attorneys' fees at or before the trial level and any appellate proceedings) arising out of any claim made by any realtor, broker, finder, or other intermediary who claims to have been engaged, contracted or utilized by the indemnifying party in connection with the transaction which is the subject matter of this Agreement.

7.    Mutual Confidentiality.  Summit and P & G shall treat with utmost confidentiality all information furnished to each by the other either previously or in the future in any medium in which it is afforded access (collectively, the "Confidential Material").  The term "Confidential Material" does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by a Party or its representatives in violation of this agreement, (ii) is or becomes available to either Party on a non-confidential basis from a source other than the other Party, or (iii) was within a Party's possession prior to its being provided by the other Party or its representatives, or (iv) has been or hereafter is independently (without the use of any Confidential Material) acquired or developed by a Party without violation of any of obligation under this confidentiality agreement.  Moreover, each Party further agrees to transmit the Confidential Material only to those of its representatives who need to know such information for the purpose of evaluating the transactions contemplated herein and who shall be advised by it of the restrictions imposed by this Agreement.  Each Party will cause such representatives to comply with the provisions hereof and shall be responsible for any breach of this Agreement by its representatives.  Notwithstanding the foregoing, if a Party or any of its representatives is required by law to disclose Confidential Material, the Party may make such disclosures and shall provide the other Party with prompt written notice thereof prior to disclosure, unless prohibited by law, so that the other Party may seek a protective order or other appropriate remedy, and the Parties shall cooperate with each other in obtaining the same.

8.    Survival.  All of the representations, warranties, covenants and agreements set forth in this Agreement shall survive until fully performed and shall not be deemed to terminate upon closing under this Agreement or the Development Agreement or closing under the Contract; *provided, however*, the obligations of Paragraph 3 above shall survive indefinitely.

9.    Entire Agreement.  This writing, the agreements referred to herein and the exhibits attached hereto constitute the entire agreement between the Parties relating to the development of the Property, and may not be modified, supplemented, discharged, or rescinded except by an instrument in writing executed by both Parties.

10.    Governing Law.  The Parties hereby agree that this Agreement and the transactions contemplated herein shall be governed by the laws of the District of Columbia.

3

0123009.01
LIB:

11.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument. In addition, the Parties may execute separate signature pages, and such signature pages (or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of both Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**SUMMIT:**

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

By:    SUMMIT PROPERTIES INC.,
       a Maryland corporation,
       its sole general partner

       By:    _____
              Name: Thomas A. Baum
              Title:   Vice President


**P & G**:

P & G, LLC
a District of Columbia limited liability company,

By:    _____
       Name: Giorgi Funisi
       Title: Maj. Partner member

0123009.01
LIB:

11.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument.  In addition, the Parties may execute separate signature pages, and such signature pages (or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of both Parties.

        IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**SUMMIT:**

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

By:    SUMMIT PROPERTIES INC.,
       a Maryland corporation,
       its sole general partner

    By:    _____
           Name:  Thomas A. Baum
           Title:    Vice President


**P & G:**

P & G, LLC
a District of Columbia limited liability company,

By:    _____
       Name:   Giorgio Furioso
       Title:    Mng. Member

4

0123009.01
LIB:

**Exhibit A**

Description of Property

## EXHIBIT A

All that certain lot or parcel of land situate and lying in the District of Columbia, and more particularly described as follows:

All of that (those) piece(s) and parcel(s) of land, including, but not limited to the appurtenances, rights of way and other hereditaments affecting the said piece(s) and parcel(s) of land, described as Lot 802 in Square 188 and also known as the Roosevelt Apartments.

[Note: Legal description to be copied from title commitment.]

**Exhibit B**

Assignment

Final

## ASSIGNMENT OF AGREEMENT OF PURCHASE AND SALE

*The Roosevelt, Washington, D.C.*

This Assignment of Contract for Purchase of Real Estate (this "Assignment") is made as of the 30th day of June, 2000 by and between P AND G, LLC, a District of Columbia limited liability company ("P and G") and SUMMIT PROPERTIES PARTNERSHIP, L.P., Delaware limited liability partnership, ("Summit"), with respect to the following:

### RECITALS

P and G and the District of Columbia Financial Responsibility and Management Assistance Authority ("Seller") entered into that certain Agreement of Purchase and Sale dated as of May 19, 2000 (the "Contract"), attached hereto and incorporated herein as Exhibit A, regarding certain real property located at 2101 Sixteenth Street, N.W., Washington, D.C., and commonly known as The Roosevelt (the "Property"), which Property is more particularly described on Exhibit B attached hereto and incorporated herein. P and G desires to assign to Summit and Summit desires to assume, all of P and G's interests and rights with respect to the Contract, as more particularly set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree as follows:

(a)     P and G hereby assigns to Summit all of P and G's interests, rights, duties and obligations under the Contract, including without limitation the right to purchase the Property under the Contract, and all of P and G's title to due diligence materials relating to the Property that were commissioned by P and G or are in the possession of P and G.

(b)     Summit hereby assumes all of P and G's interests, rights, duties and obligations under the Contract, including without limitation the right to purchase the Property under the Contract.

(c)     At Closing, Seller is hereby instructed to transfer the Property directly to Summit or to its Qualified Intermediary (as defined in the Contract) .

(d)     Any and all bills of sale, tenant lease assignments, general assignments and similar documents related to the Closing to be executed for the benefit of or delivered to "Buyer" under the Contract should be executed for the directed benefit of or delivered directly to Summit.

(e)     By its signature below, Seller (or a representative of Seller) gives its consent and agreement to this Assignment under Section 11.3 of the Contract.

(f)     Each of the assignments and assumptions provided for herein are conditioned upon the obligation of Summit to: (i) close under the Contract; and (ii) to close in escrow under

that certain side letter to the contract from P & G and Summit to the Seller dated June 14, 2000 (the "Side Letter")(Attached hereto and incorporated herein as Exhibit C). In the event that Summit shall fail to close, whether in escrow or finally, then the assignments and assumptions shall be null and void.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date first set forth above.

**WITNESS**

P and G:

P AND G, LLC
a District of Columbia limited liability company,

By: _____ ,
Name: _Gigchi Aukiui_
Title: _Parslt ._

**Summit:**

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

By: _____
Name: TOM BAUM
Title: SENIOR VICE PRESIDENT

**CONSENTED AND AGREED TO:**

**WITNESS**

DISTRICT OF COLUMBIA FINANCIAL
RESPONSIBILITY AND MANAGEMENT
ASSISTANCE AUTHORITY

By: _____      _____
Name:
Date:

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date first set forth above.

<u>WITNESS</u>

<u>P and G</u>:

P AND G, LLC
a District of Columbia limited liability company,

_____

By:    _____
      Name: _____
      Title: _____

<u>Summit</u>:

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

_____

By:    _____
      Name:
      Title:

<u>CONSENTED AND AGREED TO</u>:

DISTRICT OF COLUMBIA FINANCIAL
RESPONSIBILITY AND MANAGEMENT
ASSISTANCE AUTHORITY

By: _____
Name: Francis S. Smith
Date: June 30, 2000

<u>WITNESS</u>

DEVELOPMENT AGREEMENT

*The Roosevelt*

THIS DEVELOPMENT AGREEMENT (this "Agreement") is made as of this 29th day of January, 2001, by and between SUMMIT PROPERTIES PARTNERSHIP, L.P., a Delaware limited partnership ("Summit"), and P & G LLC, a District of Columbia limited liability company ("P & G") (Summit and P & G are sometimes individually referred to as a "Party" and collectively referred to as the "Parties").

*WHEREAS*, P & G and The District of Columbia Financial Responsibility and Management Assistance Authority ("Seller") have entered into an Agreement of Purchase and Sale, dated as of May 19, 2000 (the "Contract"), for the sale of that certain parcel of land, improved by a multi-storied hotel/apartment building, located at 2101 16th Street, N.W., Washington, D.C. and commonly known as "The Roosevelt" (the "Property"), which Property is more particularly described in Exhibit A attached hereto and incorporated herein by this reference. Summit desires to acquire the Property and develop the Property as residential apartments. P & G and Summit intend that P & G shall contribute the Contract to Summit for equity in Summit and have executed a contribution agreement for such purpose, and further intend that the Property shall be developed by the Parties on the terms and conditions hereinafter set forth below;

NOW, THEREFORE, in consideration of Ten and No/100 Dollars ($10.00), the mutual promises and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  Assignment of Contract and Due Diligence Materials.  By a separate agreement (the "Contribution Agreement") and assignment (the "Assignment"), P & G shall assign, and Summit shall assume, (i) all of P & G's interests, rights and obligations under the Contract and (ii) all of P & G's title to due diligence materials relating to the Property that were commissioned by P & G or are in the possession of P & G. Such assignment shall be deemed a contribution to the capital of Summit and given in return for the issuance of units in Summit as set forth in the Contribution Agreement. Pursuant to the terms of the Contribution Agreement, the Assignment and the intention of the Parties, the assignments and assumptions described above are conditioned upon the obligation of Summit to close under the Contract. In the event that Summit shall fail to close then the assignments and assumptions shall be null and void.

2.  Acquisition Fee and Development Fee.    For its development efforts to date, Summit shall be obligated to pay to P & G Six Hundred Thousand and No/100 Dollars ($600,000.00), payable to P & G as follows:

    (a)  Summit has previously reimbursed P & G for development expenses of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Acquisition Fee"); and

    (b)  Summit shall pay P & G Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) (the "Development Fee").

0123009.01
L:IB:

3.   Tenant Costs. (a)    All fees, costs and expenses, including but not limited to legal fees and expenses, settlement costs, court costs and judgments associated with the defense and attempted resolution of any and all claims of tenants, whether arising under the District of Columbia Rental Housing Conversion and Sale Act (the "Act") or under any other claim or cause of action, but excluding all costs related to Rent Control (as hereinafter defined), (the "Tenant Costs") in an amount up to and including $1 million ($1,000,000.00) shall be shared equally by the Parties. The payment of any Tenant Costs in excess of $1 million shall be the sole responsibility of Summit, but incurring Tenant Costs in excess of $1 million shall be subject to Summit's sole discretion.

(b)    The parties agree that P & G's share of the estimated Tenant Costs is One Hundred Ninety Thousand and No/100 Dollars ($190,000.00). This is comprised of 150,000.00, which represents fifty percent (50%) of the estimated total legal fees and costs related to the tenant claims (the "Legal Fees") and $40,000, which is P&G's share of the actual cost to settle claims of the tenants. In the event that the actual Legal Fees exceed $300,000.00, P&G shall, upon receipt of written notice from Summit, promptly pay 50% of the amount of any such excess to Summit. In the event the actual Legal Fees are less than $300,000.00, Summit shall promptly pay to P&G an amount equal to 50% of the difference between $300,000.00 and the actual Legal Fees

4.   Payment of Development Fee.

a.    The Development Fee, less P & G's share of the Tenant Costs, i.e., $190,000.00, shall be paid to P & G upon recordation of a deed to the Property from Seller to Summit or its designee.

b.    Upon the recordation of the deed described in subparagraph 4a above, Summit shall pay to P & G $100,000 plus any interest earned thereon while in escrow, in addition to all other payments that may then be due.

5.   Closing. Closing shall be contingent upon Seller's ability to deliver good title to the Property to Summit in accordance with the terms of the Contract.

6.   Co-Developer. P & G shall serve as co-developer, with Summit, of the Property. As such, P & G shall provide advice and counsel to Summit on issues relating to zoning, design and marketing of the Property, as well as with any other issues pertaining to, or involving negotiations or dealings with, the Seller, the District of Columbia and the surrounding community. In particular, P & G shall work toward resolving to Summit's satisfaction, all obligations, financial or otherwise, with respect to the issues relating to former tenants of the Property. The parties shall enter into a supplemental agreement, as circumscribed by paragraph 4 as to scope and amount of consideration due P & G, to set the terms and compensation to P & G for its co-developer services, which shall be mutually acceptable.

7.   Incentive Payment; Termination Payment; Preferred Return.

0123009.01
LIB:

a.  P & G shall be entitled to receive an annual incentive payment (the "Incentive Payment"), beginning on the first day of the calendar month following the earliest date by which both (a) substantial completion of the proposed renovations of the Property by Summit and (b) ninety percent (90%) occupancy of the residential units of the Property by bona fide third-party tenants has occurred (the "Stabilization Date"). The Incentive payment shall be an amount equal to one and three-quarters percent (1.75%) of the gross revenue of the Property. The payment of the Incentive Payment shall be subordinated to Summit's receipt of a Ten Percent (10%) cumulative compounded annual return on its Investment (as hereinafter defined) in the Property ("Preferred Return"). In calculating the Preferred Return (i) the first annual period for the calculation shall begin on the date on which the certificate of occupancy for all of the Property shall be issued and end 12 months thereafter (the "First Annual Period"); (ii) cumulative compound return shall be calculated for the First Annual Period and each succeeding 12 month period thereafter; and (iii) the period prior to the First Annual Period shall not be considered in calculating cumulative compound return.

b.  For the purposes of this Agreement, "Investment" shall mean the sum of all actual costs incurred by Summit in connection with the acquisition, development and operation of the Property. Summit shall make available for inspection by P & G the income and expense statements used to calculate the operating revenue, Investment and Preferred Return. For purposes of the foregoing, operating expenses will be computed in accordance with Summit's existing practice for its other properties and reserves will be established in a manner consistent with Summit's practices for its other properties.

c.  For any year in which any portion of the Incentive Payment is subordinated and unpaid, such unpaid portion of the Incentive Payment will be payable without interest in the subsequent year or years so long as the Preferred Return has been paid. Deferred Incentive Payment(s) shall no longer be due or payable after such time as either party exercises a Termination (as hereinafter defined).

d.  In the event that the parties shall disagree as to the calculation of Preferred Return, Investment or operating income with respect to the Property, the parties shall attempt to resolve the matter through negotiation. In the event that the parties are unable to resolve their difference through negotiation, they shall each appoint a Certified Public Accountant (the "CPA") who shall meet to arbitrate the dispute. They shall do so in accordance with the terms of this agreement and generally accepted accounting procedures consistently applied. Should the parties' accountants be unable to resolve the dispute then they shall select a third CPA who shall resolve the matter. The decisions of the third CPA shall be final and shall assess costs, including the fees of all three CPAs, to the non-prevailing party.

8.  Termination. On and after the 36th month following the Stabilization Date, P & G shall have the right to require the purchase by Summit of P & G's interests in the Property and under this Agreement, and Summit shall have the right to purchase P & G's interests in the Property and

3

under this Agreement (in either event, a "Termination"). The purchase price for such interests (the "Termination Payment") shall be an amount equal to ten times (10x) the cash due to P & G as Incentive Payments for the previous twelve (12)-month period, excluding any portion thereof which had been deferred from any period prior to said twelve (12)-month period. In no event, however, shall the Termination Payment be less than $250,000.

9.    Sale, Assignment prior to Termination Date: Prior to a Termination, Summit may only sell, assign or transfer the Property or its rights and obligations under this Agreement, the Contract, the Side Letter, the Escrow Agreement, the Letter of Credit and all other agreements between the parties, or between and among the parties and the Authority. (the "Summit- P & G Agreements") if it causes the buyer, assignee or transferee, as the case may be, to assume all of its obligations to P & G under the Summit–P & G Agreements. Summit further represents and warrants that it will not sell, assign or transfer the Property except to a party that is able to perform its obligations the Summit-P & G Agreements.

10.    Rent Control. Summit and P & G shall work together to resolve all issues arising from the application of District of Columbia's rent control laws, as set out in §§ 45-2501 et seq. of the D.C. Code ("Rent Control") to the Property. Subject to its approval in advance and sole discretion, Summit shall pay up to and including $350,000.00 for costs, fees, expenses and settlements relating to Rent Control (the "Rent Control Costs"). Summit may elect to incur additional Rent Control Costs in its sole discretion.

11.    Additional Assistance Fee. P & G shall be entitled to an additional fee of $250,000 if prior to a Termination it shall secure: (i) the determination by the Rental Accommodations and Conversion Division ("RACD") and/or the Rental Housing Commission ("RHC") that the Roosevelt is exempt from Rent Control; (ii) the repeal, applicable to the Property, of Rent Control in the District of Columbia; or (iii) the execution of a 70% Voluntary Agreement, pursuant to D.C. Code §45-2525, (a "70% Agreement") by the Tenants Association and/or bona fide tenants (including without limitation those who have the right to return to the building per the RFO (as defined in the Contract), provided that such 70% Agreement is approved by the RACD, establishing rent ceilings binding upon all living units within the Property, averaging $4.50 per square foot and not less than $3.00 per square foot for any living unit, and also providing for consent of the signatories to condominium conversion language approving the conversion of the Roosevelt to condominiums pursuant to D.C. Code §§45-1601 et. seq.

12.    Notices.      Any notice, request, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be deemed to be delivered (a) upon receipt, if delivered by facsimile or if hand delivered, (b) on the first business day after having been delivered to a national overnight air courier service, or (c) three business days after deposit in registered or certified mail, return receipt requested, addressed as follows:

4

SUMMIT:

Summit Properties Partnership, L.P.
6500 Rock Spring Drive Suite 100
Bethesda, Maryland 20817
Attention: Thomas A. Baum
Telephone: (301) 530-8800
Facsimile: (301) 530-7636

with additional copies to:

David H. Jones, Esq.
Kennedy Covington Lobdell & Hickman, L.L.P.
Bank of America Corporate Center
100 N. Tryon Street, Suite 4200
Charlotte, North Carolina 28202
Telephone: (704) 331-7481
Facsimile: (704) 331-7598

P & G, LLC
c/o Furioso Development
1520 16th Street, NW, Unit 101,
Washington, DC 20036
Attention: Giorgio Furioso
Telephone: (202) 518-7888
Facsimile: (202) 518-7828

with additional copies to:

Michael J. Conlon, Esquire
Conlon, Frantz, Phelan & Pires, LLP
1818 N Street, NW, #700
Washington, DC 20036
Telephone: (202) 331-7050
Facsimile: (202) 331-9306

13.    <u>Assignment; Successors and Assigns</u>.  This Agreement may be assigned, in whole or in part, by one party, only with the prior written consent of the other party (which consent shall not be unreasonably withheld), and shall be binding upon and shall inure to the benefit of any successors and assigns of the Parties.  Any assignment hereunder shall be in accordance with the provisions of paragraph 9 of this Agreement.

14.    <u>Relationship of the Parties; Publicity</u>.  Except as otherwise provided in this Agreement or any of the supplemental agreements hereto referred to herein, the relationship between the Parties is contractual in nature and no partnership or joint venture between the Parties is created

5

hereby. Furioso Development Corporation shall be recognized in all public announcements and press releases as a co-developer of the Property and shall be identified as a co-developer of the Property on any identification or site sign erected at the Property by Summit. The language, descriptions and layout used in any public announcement, press release or identification or site sign shall be determined by Summit in its sole discretion. Neither P & G nor Furioso Development Corporation nor any affiliated person or entity shall issue or authorize the issuance of any public announcement, advertisement or press release regarding the Property without Summit's consent in writing thereto.

15.  No Brokers. The Parties each warrant and represent to each other that no realtor, broker, finder, or other intermediary has been involved with or employed by such party in connection with the transaction contemplated by this Agreement. The Parties agree to indemnify, hold harmless and defend the other from and against claims, loss, liability, cost and expense (including reasonable attorneys' fees at or before the trial level and any appellate proceedings) arising out of any claim made by any realtor, broker, finder, or other intermediary who claims to have been engaged, contracted or utilized by the indemnifying party in connection with the transaction which is the subject matter of this Agreement.

16.  Mutual Confidentiality. Summit and P & G shall treat with utmost confidentiality all information furnished to each by the other either previously or in the future in any medium in which it is afforded access (collectively, the "Confidential Material"). The term "Confidential Material" does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by a Party or its representatives in violation of this agreement, (ii) is or becomes available to either Party on a non-confidential basis from a source other than the other Party, or (iii) was within a Party's possession prior to its being provided by the other Party or its representatives, or (iv) has been or hereafter is independently (without the use of any Confidential Material) acquired or developed by a Party without violation of any of obligation under this confidentiality agreement. Moreover, each Party further agrees to transmit the Confidential Material only to those of its representatives who need to know such information for the purpose of evaluating the transactions contemplated herein and who shall be advised by it of the restrictions imposed by this Agreement. Each Party will cause such representatives to comply with the provisions hereof and shall be responsible for any breach of this Agreement by its representatives. Notwithstanding the foregoing, if a Party or any of its representatives is required by law to disclose Confidential Material, the Party may make such disclosures and shall provide the other Party with prompt written notice thereof prior to disclosure, unless prohibited by law, so that the other Party may seek a protective order or other appropriate remedy, and the Parties shall cooperate with each other in obtaining the same.

17.  Survival. All of the representations, warranties, covenants and agreements set forth in this Agreement shall survive until fully performed and shall not be deemed to terminate upon closing under this Agreement or the Contribution Agreement or closing under the Contract; *provided, however*, the obligations of Paragraph 16 above shall survive indefinitely.

0123009.01
LIB:

18.    <u>Entire Agreement</u>.  This writing, the agreements referred to herein and the exhibits attached hereto constitute the entire agreement between the Parties relating to the development of the Property, and may not be modified, supplemented, discharged, or rescinded except by an instrument in writing executed by both Parties.

19.    <u>Governing Law</u>.   The Parties hereby agree that this Agreement and the transactions contemplated herein shall be governed by the laws of the District of Columbia.

20.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument.  In addition, the Parties may execute separate signature pages, and such signature pages (or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of both Parties.

**[SIGNATURES ON FOLLOWING PAGE]**

0123009.01
LIB:

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**SUMMIT**:

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

By:     SUMMIT PROPERTIES INC.,
        a Maryland corporation,
        its sole general partner

        By:     _____
                Name: Thomas A. Baum
                Title:   Vice President

**P & G**:

P & G, LLC
a District of Columbia limited liability company,

By:     _____
        Name: Giorgio Furioso
        Title: Mang. Prtnr. Member

8

0123009.01
LIB:

## Exhibit A

Description of Property

0123009.01
LIB:

## EXHIBIT A

All that certain lot or parcel of land situate and lying in the District of Columbia, and more particularly described as follows:

All of that (those) piece(s) and parcel(s) of land, including, but not limited to the appurtenances, rights of way and other hereditaments affecting the said piece(s) and parcel(s) of land, described as Lot 802 in Square 188 and also known as the Roosevelt Apartments.

[Note: Legal description to be copied from title commitment.]

## ASSIGNMENT OF AGREEMENT OF PURCHASE AND SALE

*The Roosevelt, Washington, D.C.*

This Assignment of Contract for Purchase of Real Estate (this "Assignment") is made as of the 30th day of June, 2000 by and between P AND G, LLC, a District of Columbia limited liability company ("P and G") and SUMMIT PROPERTIES PARTNERSHIP, L.P., Delaware limited liability partnership, ("Summit"), with respect to the following:

### RECITALS

P and G and the District of Columbia Financial Responsibility and Management Assistance Authority ("Seller") entered into that certain Agreement of Purchase and Sale dated as of May 19, 2000 (the "Contract"), attached hereto and incorporated herein as Exhibit A, regarding certain real property located at 2101 Sixteenth Street, N.W., Washington, D.C., and commonly known as The Roosevelt (the "Property"), which Property is more particularly described on Exhibit B attached hereto and incorporated herein. P and G desires to assign to Summit and Summit desires to assume, all of P and G's interests and rights with respect to the Contract, as more particularly set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree as follows:

(a)   P and G hereby assigns to Summit all of P and G's interests, rights, duties and obligations under the Contract, including without limitation the right to purchase the Property under the Contract, and all of P and G's title to due diligence materials relating to the Property that were commissioned by P and G or are in the possession of P and G.

(b)   Summit hereby assumes all of P and G's interests, rights, duties and obligations under the Contract, including without limitation the right to purchase the Property under the Contract.

(c)   At Closing, Seller is hereby instructed to transfer the Property directly to Summit or to its Qualified Intermediary (as defined in the Contract).

(d)   Any and all bills of sale, tenant lease assignments, general assignments and similar documents related to the Closing to be executed for the benefit of or delivered to "Buyer" under the Contract should be executed for the directed benefit of or delivered directly to Summit.

(e)   By its signature below, Seller (or a representative of Seller) gives its consent and agreement to this Assignment under Section 11.3 of the Contract.

(f)   Each of the assignments and assumptions provided for herein are conditioned upon the obligation of Summit to: (i) close under the Contract; and (ii) to close in escrow under

that certain side letter to the contract from P & G and Summit to the Seller dated June 14, 2000 (the "Side Letter")(Attached hereto and incorporated herein as Exhibit C).  In the event that Summit shall fail to close, whether in escrow or finally, then the assignments and assumptions shall be null and void.

### [SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date first set forth above.

**WITNESS**                                        **P and G:**

P AND G, LLC
a District of Columbia limited liability company,

By: _____
Name: Giorgi Aukius
Title: Pesdnt.

**Summit:**

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

By: _____
Name: TOM BAUM
Title: SENIOR VICE PRESIDENT

**CONSENTED AND AGREED TO:**                       **WITNESS**

DISTRICT OF COLUMBIA FINANCIAL
RESPONSIBILITY AND MANAGEMENT
ASSISTANCE AUTHORITY

By: _____               _____
Name:
Date:

IN WITNESS WHEREOF, the undersigned parties have executed this Assignment effective as of the date first set forth above.

WITNESS

P and G:

P AND G, LLC
a District of Columbia limited liability company,

_____

By:    _____
       Name: _____
       Title: _____

Summit:

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

_____

By:    _____
       Name: _____
       Title: _____

CONSENTED AND AGREED TO:

DISTRICT OF COLUMBIA FINANCIAL
RESPONSIBILITY AND MANAGEMENT
ASSISTANCE AUTHORITY

By: _____
Name: Francis S. Smith
Date: June 30, 2000

WITNESS

_____

## AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** (this "Agreement") is made and entered into as of May 19, 2000, by and between the **DISTRICT OF COLUMBIA FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE AUTHORITY** ("Seller" or "the Authority"), and **P AND G, LLC**, a District of Columbia limited liability company ("Purchaser") (collectively, "the Parties").

### R E C I T A L S:

WHEREAS, Seller is the owner of that certain Property (hereinafter defined) which is more particularly described in **Exhibit A** attached hereto, which is commonly known as the Roosevelt, located at 2101 Sixteenth Street, N.W., Washington, D.C. (the "Property");

WHEREAS, Purchaser wishes to purchase, and Seller desires to sell, the Property subject to the terms and conditions set forth herein;

WHEREAS, Purchaser has provided satisfactory evidence to Seller of Purchaser's proposed equity financing to both purchase and renovate the Property without using public money or tax subsidies (provided that this reference to "tax subsidies" does not include historic tax credits or other tax benefits for which the Property or the owner of the Property may be eligible);

NOW, THEREFORE, the Parties hereto enter into this Agreement as of the date indicated above.

### ARTICLE I

### Definitions

As used in this Agreement, unless the context otherwise requires or it is otherwise herein expressly provided, the following terms shall have the following meanings:

1.1    Deposit:    Five Hundred Thousand Dollars ($500,000.00) deposited with the Authority, together with any accrued interest thereon.

1.2    Effective Date:    The date of execution of this Agreement shall be May 19, 2000.

1.3    Escrow Agent or Title Company:    A title insurance agency selected by the Purchaser, subject to the reasonable approval of the Seller.

1.4    Permitted Title Exceptions:    Those exceptions to title approved by Purchaser pursuant to Section 6.3, and those exceptions to title described in Section 5.4.

1.5    Property:    All of Seller's right, title and interest in and to the following:

(a)     the real property of Seller known as Lot 802, Square 188 in the District of Columbia, as further described on **Exhibit A** attached hereto and made a part hereof by reference ("Land");

(b)     all buildings, structures and improvements of every kind and nature owned by Seller (the "Improvements") located on the Land and all machinery, equipment, fixtures and property owned by Seller (real and personal) of every kind, character and description located on the Land or in the Improvements used or useful in connection with the operation of the Improvements, including, without limitation, all maintenance supplies and equipment, all compressors, lighting and electrical and plumbing fixtures, systems and equipment, heating fixtures, systems and equipment, air conditioning fixtures, systems and equipment, together with refrigerators, stoves/cooktops/ovens and fan coil units for each unit within the Improvements, and all furniture and office equipment owned by Seller and located in the Improvements;

(c)     all right, title and interest, if any, of Seller in and to any land lying in the bed of any street, road, alley or avenue, open or proposed, in front of or adjoining the Property, to the center line thereof, any riparian or water rights, any mineral rights, air rights, and all such right, title and interest in and to any award unpaid at the date thereof on account of any Taking (as hereinafter defined) of the Property or any part thereof or on account of any damage to the Property or any part thereof by reason of change of grade of any street or otherwise;

(d)     to the extent assignable by Seller, all of Seller's right, title and interest in and to all original or as-built architectural, engineering and similar plans, specifications, drawings, renderings, studies, shop drawings, plats, surveys and other similar items pertaining to the Land or the Improvements, and all development rights;

(e)     to the extent assignable by Seller, all of Seller's right, title and interest in and to any and all trade names, trademarks, logos and telephone numbers used in connection with the operation of the Property;

(f)     all rights of way or use, servitudes, licenses, easements, tenements, hereditaments and appurtenances now or hereafter belonging to or benefiting any of the foregoing.

1.6     Purchase Price:  The price to be paid for the Property in the amount and manner specified in Section 2.2.

1.7     Request for Offers:  That certain "Request for Offers for the Disposition of The Roosevelt" issued by the District of Columbia Department of Housing and Community Development on April 9, 1999 requesting offers for the purchase of the Property, as subsequently modified, amended or supplemented, including a letter from the Authority dated November 3, 1999 requesting best and final offers (the "Request for Best and Final Offers") (the Request for Offers is also referred to herein as the "RFO").

1.8     Settlement:  The consummation of the sale and purchase of the Property provided for in this Agreement to occur as provided in Article VI hereof.

1.9    Settlement Date: Forty-five (45) days from the date of execution of this Agreement by all parties hereto, or such other date as may be mutually agreed by Purchaser and Seller. The Settlement Date may be extended pursuant to the provisions of Section 2.5 or Article V of this Agreement.

## ARTICLE II

### Sale and Purchase

2.1    Purchase. Subject to the terms hereof, Seller hereby agrees to sell to Purchaser and Purchaser hereby agrees to purchase from Seller all right, title and interest of Seller in and to the Property utilized in connection with Seller's ownership of the Property. The Property is to be sold and acquired at Settlement subject to satisfaction or waiver of the conditions set forth in Article V hereof, on or before the Settlement Date. At the time of Settlement, the Property shall be delivered to Purchaser in its then "as is" condition, including any insurance proceeds received or to be received by Seller for an occurrence on or after the date of this Agreement, except that the Seller shall deliver to Purchaser good, marketable title subject only to the Permitted Title Exceptions as herein after defined in Section 5.4.

2.2    The Purchase Price.

(a)    The Purchase Price to be paid by Purchaser to Seller for the Property shall be Ten Million One Hundred Thousand and no/100 Dollars ($10,100,000.00).

(b)    The Purchase Price shall be payable as follows:

(i)    The Deposit (excluding any accrued interest which shall be paid to Purchaser by Escrow Agent) shall be applied to the Purchase Price at Settlement. The Deposit shall be held by Escrow Agent pursuant to an escrow agreement ("Escrow Agreement") to be entered into among Escrow Agent, Seller and Purchaser, which Escrow Agreement is attached hereto as **Exhibit B**.

(ii)    At Settlement, an amount equal to the difference between (A) the Purchase Price, along with all closing costs payable by the Purchaser as per Section 6.1, and (B) the Deposit shall be paid by Purchaser to the Title Company by wire transfer of immediately available funds.

2.3    Environmental Matters.

(a)    Definitions. As used in this Agreement, unless the context otherwise requires or it is otherwise herein expressly provided, the following terms shall have the following meanings:

(i)    Environment: All air, surface water, groundwater, or land, including land surface or subsurface, and includes all fish, wildlife, biota and all other natural resources.

(ii)    Environmental Claims: Any and all administrative or judicial actions, suits, orders, claims, liens, notices of violation or proceedings of any kind (collectively

"Claims") for damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, costs, disbursements or expenses (including reasonable attorneys' fees) related to any applicable Environmental Law or any Environmental Permit brought, issued or asserted by: (1) a Governmental Authority for compliance, damages, penalties, removal, response, remedial or other action at the Property pursuant to any applicable Environmental Law; or (2) a third party seeking damages for personal injury or property damage resulting from the Release of a Hazardous Materials at, to or from the Property.

(iii)    Environmental Laws:  All federal, state and local laws, statutes, ordinances, codes, rules, regulations, orders or decrees relating to protection of the Environment and/or governing the handling, use, generation, treatment, storage, transportation or disposal of Hazardous Materials, including but not limited to, as amended: the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; and the Clean Air Act, 42 U.S.C. §§ 7401 et seq.

(iv)    Environmental Permits:    All permits, licenses, approvals, authorizations, or consents required by any Governmental Authority under any applicable Environmental Law and includes any and all orders, consent orders or binding agreements issued or entered into by a Governmental Authority under any applicable Environmental Law.

(v)    Governmental Authority:  Any federal, state, District of Columbia or international body having jurisdiction over the Property, including, but not limited to:  the United States Environmental Protection Agency; the District of Columbia Department of Consumer and Regulatory Affairs; and the District of Columbia Department of Health.

(vi)    Hazardous Materials:  Any substance, material, condition, mixture or waste which is now or hereafter (1) defined as a "hazardous waste," "hazardous material," "extremely hazardous waste," "restricted hazardous waste," "oil," "pollutant" or "contaminant" under any Environmental Law; (2) classified as radioactive material; (3) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. Section 1317; (4) defined as a "hazardous waste" pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. 6903; (5) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601; (6) determined to be a "hazardous chemical substance or mixture" pursuant to the Toxic Substances Control Act, 15 U.S.C. Section 2605; or (7) a "hazardous air pollutant" listed pursuant to the Clean Air Act, 42 U.S.C. Section 7412.

(vii)    Release:    Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Hazardous Material into the Environment.

(b)    Seller's Environmental Representations and Warranties.  Seller represents and warrants to Purchaser that to the actual knowledge of Seller, Seller has not received any written notice from any Governmental Authority of any Environmental Claims. Seller makes no

- 4 -

representations or warranties of any kind with respect to the environmental condition of the Property or Seller's compliance with any Environmental Law with respect to the Property. Seller is providing the documents and information referenced in **Exhibit C** without any representation or warranty as to the accuracy or completeness thereof.

(c)    "As Is Condition." The Property (including the Improvements and any personal property conveyed by this Agreement) is to be purchased in "as is" condition, without warranty as to its physical condition, the availability of utilities or other existing conditions; and upon and after Settlement, Purchaser shall indemnify Seller, defend and hold Seller harmless from, assume and release Seller from, all of Seller's liability under any Environmental Law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. and the regulations promulgated thereunder (as amended from time to time); the Clean Air Act, 42 U.S.C. 7401, et seq. and the regulations promulgated thereunder (as amended from time to time); the Clean Water Act, 33 U.S.C. 1251 et seq. and regulations promulgated thereunder (as amended from time to time); the Resource, Conservation and Recovery Act, 42 U.S.C. 6901 et seq. and regulations promulgated thereunder (as amended from time to time); the Oil Pollution Act of 1990, 33 U.S.C. 2701 et seq. and regulations promulgated thereunder (as amended from time to time); and from all liability relating to (i) soil or groundwater contaminated by Hazardous Material(s), and (ii) the Release of or presence of any other pollutant or contaminant designated as a hazardous substance by Congress or the United States Environmental Protection Agency (EPA) or defined by any other federal or District of Columbia law, ordinance, code, rule, regulation, order or decree.

(d)    Confidentiality.    In addition to any other provisions regarding confidentiality in this Agreement, Purchaser covenants, and shall cause its officers, directors, employees, representatives, agents and consultants to covenant, to hold and maintain as confidential to the extent permitted by law, all documents referenced in **Exhibit C**, and any and all other information related to any environmental matters at the Property, or the status of the Property's compliance with Environmental Laws or Permits obtained prior to or at the Settlement Date. This confidentiality covenant shall survive the termination of this Agreement. In the event that the transaction contemplated by this Agreement does not occur, Purchaser shall, and shall cause its officers, directors, employees, representatives, agents and consultants to, turn over to Seller: all copies of any of the documents and reports related to environmental matters at the Property or the Property's compliance with Environmental Laws and Permits; and any other documents provided by Seller or obtained by Purchaser, its officers, directors, employees, representatives, agents and consultants related to environmental matters at the Property or the Property's compliance with Environmental Laws and Permits.    Until such time as this Agreement is terminated and at any time after the Settlement Date, the Purchaser shall have the right to disclose any information regarding the Property in any commercial context.

(e)    Waiver of Right to Seek Contribution. Purchaser waives any and all rights it may have at law or in equity to seek contribution from Seller for any Environmental Claims, except for claims for breach of the representations and warranty set out in Section 2.3(b).

(f)    Additional Purchaser's Indemnification. Upon and after the Settlement, Purchaser shall and hereby does agree, at its sole cost and expense, to indemnify, protect and

- 5 -

save harmless Seller from and against any and all Environmental Claim(s) resulting from or arising out of any of the following:

(i)      any violation by Purchaser of any applicable Environmental Law or any Environmental Permit in effect after the Settlement Date;

(ii)      any and all Environmental Claims alleged to have resulted from or arisen out of (1) a Release of Hazardous Materials at the Property after the Settlement Date; (2) any condition or activity at the Property after the Settlement Date not in compliance with applicable Environmental Laws or Environmental Permits in effect at the time; or (3) any condition at the Property or activity at the Property that results in or forms the basis of an Environmental Claim made, given, issued, delivered, asserted or filed after the Settlement Date; and

(iii)      any and all Environmental Claims related to the performance by Purchaser, a federal, state or District of Columbia agency, or any of their respective employees, agents, representatives, contractors or subcontractors of any corrective, investigative, containment, removal, cleanup, or other response or remedial action at the Property after the Settlement Date.

(iv)      Purchaser shall indemnify, protect and save harmless Seller from and against all Environmental Claims resulting from Purchaser's entry into the Property or Improvements prior to Settlement.

2.4      <u>Request for Offers for the Disposition of the Property</u>. The purchase of the Property shall be subject to the conditions set forth in the Request for Offers, the Request for Best and Final Offer, the Purchaser's Response to the RFO for the Roosevelt Building dated June 23, 1999, and the Purchaser's Offer to Purchase the Roosevelt dated December 10, 1999, all as further modified by this Agreement.  In the event of conflict between the provisions of this Agreement of any of the foregoing documents, the provisions of this Agreement shall be controlling.

2.5      <u>Additional Provisions</u>. Without limitation, purchase of the Property is subject to: (i) Seller's grant of the ability of "tenants in possession" on May 27, 1987, the date the District of Columbia government acquired the Property, to reoccupy apartments after renovation (the "Return Option"), and (ii) Seller's grant of the applicability of limited provisions of the Rental Housing Conversion and Sale Act of 1980 (D.C. Code §§ 45-1601 et seq.) which grant includes a first refusal option by the registered Tenants' Organization representing the former tenants of the Property to match the terms and conditions of this Agreement (the "Refusal Option").  The parties hereto agree that Seller may grant the registered Tenant Organization: (a) fifteen (15) days from receipt of a signed copy of this Agreement, to execute and deliver this Agreement and proffer a Five Hundred Thousand dollar ($500,000.00) deposit to Seller in immediately available funds; (b) an additional thirty (30) days after the date the items referenced in the immediately preceding clause (a) have been received by the Seller to provide Seller with satisfactory evidence of the ability to finance the purchase of the Property by the Settlement Date; and (c) an additional sixty (60) days after provision of such evidence of financing to consummate the sale

- 6 -

and purchase of the Property under the terms of this Agreement. Purchaser shall defend, indemnify and hold Seller harmless with regard to any claims, including, without limitation, lawsuits, which are made, asserted or filed after the Settlement Date, and which are filed by, through or on behalf of any former tenants of the Property with regard to the Rental Housing Conversion and Sale Act of 1980 (D.C. Code §§ 45-1601 et seq.).

2.6     Exemption.  Seller agrees to execute and deliver to Purchaser the letter in the form attached hereto as **Exhibit D**.

## ARTICLE III

## Representations and Warranties

3.1     Seller represents and warrants to Purchaser that:

(a)     Legal Status.  (i) Seller has the legal power to enter into and deliver this Agreement and to consummate the transactions provided for herein, and (ii) the undersigned officers of Seller have full power, authority and legal right to enter into and deliver this Agreement and to consummate the transactions provided for herein.

(b)     Compliance with Other Instruments.  Neither the entering into of this Agreement nor the consummation of the transactions contemplated hereby will constitute or result in a violation or breach by Seller of its governing documents.

(c)     Mechanics' Liens.  Seller shall provide the Title Company with customary written assurance or title affidavit so as to enable the Title Company to furnish Purchaser with a title insurance policy without extraordinary exception for mechanics' liens.

(d)     Insurance.  Seller has obtained casualty insurance against damage or destruction of the Property in an amount at least equal to the Purchase Price (less deductible), and will maintain the same in full force and effect until the Settlement.

(e)     Former Tenants.  Seller has entered into no written agreement with any association of former tenants of the Property that would expand upon the Return Option and the Refusal Option.

3.2     Purchaser represents and warrants to Seller that:

(a)     Legal Status.  (i) Purchaser has the legal power to enter into and deliver this Agreement and to consummate the transactions provided herein, and (ii) the undersigned Managing Partner of Purchaser has full power, authority and legal right to enter into and deliver this Agreement and to consummate the transaction provided herein.

(b)     Compliance with Other Instruments.  Neither the entering into of this Agreement nor the consummation of the transactions contemplated hereby will constitute or result in a violation or breach by Purchaser of its governing documents.

(c)    Compliance with RFO Response.  Purchaser intends to develop the Property substantially in compliance with its response to the RFO.

3.3    Event of Breach.

(a)    In the event of any Seller's representations and warranties hereunder prove to be untrue or unfulfilled in any material respect and the same shall be made known to Purchaser prior to Settlement and notice thereof is promptly given to Seller by Purchaser, (i) if Seller elects to cure such breach, Settlement shall be extended for such reasonable time, not to exceed thirty (30) days, as is necessary for Seller to effect the cure of such breach, or (ii) if Seller is unable or unwilling to cure such breach within the foregoing time period, Purchaser may elect either to waive such breach and proceed to Settlement subject to all other terms and conditions hereof or to terminate this Agreement, whereupon Purchaser shall receive a refund of the Deposit and the parties shall be relieved of all further obligations hereunder.

(b)    In the event any of Purchaser's representations and warranties hereunder prove to be untrue or unfulfilled in any material respect and the same shall be made known to Seller prior to Settlement, notice thereof shall be promptly given by Purchaser by Seller.  If Purchaser is unable or unwilling to cure such breach prior to date of Settlement, Seller may elect either (i) to waive such breach and proceed to Settlement subject to all other terms and conditions hereof or (ii) to terminate this Agreement, whereupon Purchaser shall be deemed to forfeit the Deposit to the Seller and the parties shall be relieved of all further obligations hereunder.

## ARTICLE IV

## Survival of Representations and Warranties

4.1    Survival and Merger.  The representations and warranties set forth in Article III of this Agreement shall be deemed to have been made again on and as of the Settlement Date and shall be true and correct on the Settlement Date and the execution, delivery and recordation of the deed of conveyance, and shall be merged therein, at which time said representations and warranties shall terminate, except (i) each party's representation regarding broker's fees in Section 9.1; (ii) the parties' obligations and indemnifications regarding Environmental Claims contained in Section 2.3 (but Seller is not obligated to provide any environmental information or notices after Settlement); (iii) Purchaser's obligations and indemnifications arising after Settlement as referenced in Section 2.5 and (iv) Purchaser's obligations and indemnifications regarding entry contained in Section 5.1, shall remain in force and effect and shall survive the execution and delivery of the deed of conveyance or termination of this Agreement, and shall not be merged therein.  Purchaser's obligations, indemnifications, representations or warranties contained in Section 2.3(c) of this Agreement shall terminate five (5) years after the Settlement Date.

## ARTICLE V

## Covenants and Conditions of Settlement

The obligations of Purchaser hereunder shall be subject to the fulfillment of the following covenants and conditions on or prior to Settlement, and, to the extent applicable to Seller, Seller agrees to fulfill such covenants and conditions on or prior to Settlement:

5.1    Purchaser's Access to Property.  Subject to the provisions in this Section 5.1, the Seller has granted Purchaser limited rights of access to the Property, and Seller and Purchaser have agreed that such access shall be for the sole purpose of conducting such tests or studies as are necessary for construction planning and/or expediting the construction process, and in no event shall any right of access granted under this Section 5.1 be deemed to: (i) modify the provisions of Section 2.3(c) or (ii) grant to Purchaser any due diligence review period.  Further, such access granted hereunder and/or the results of such studies or tests conducted shall not be claimed by Purchaser as grounds for termination of this Agreement.  Purchaser or its representatives shall have the right, prior to Settlement, to enter upon the Property at reasonable times upon prior notice to Seller and, if required by Seller, accompanied by a representative of Seller, to make engineering and other studies and tests including without limitation the right to make penetrations and borings, subject to the terms and conditions set forth in any Right of Entry Agreement dated November 16, 1999 by and between the Purchaser and the Seller as such has been subsequently modified, extended, amended or supplemented (the "Access Agreement"). The Purchaser and Seller acknowledge and agree that the terms and conditions set forth in the Access Agreement shall survive execution of this Agreement, shall not be superseded by this Agreement, and in the event of any conflict between the terms and conditions of this Agreement and the Access Agreement, the terms and conditions of the Access Agreement shall control.  In the event of any termination of this Agreement prior to Settlement, Purchaser shall promptly repair, at its sole expense, any damage done to the Property as a result of such entry or tests, studies and investigations so as to restore the Property to its condition immediately prior to such entry.  Purchaser shall and does hereby indemnify and hold harmless Seller against any and all losses, liabilities, costs and expenses, including, but not limited to Environmental Claims, including without limitation, reasonable attorneys' fees, caused by the entry onto the Property by Purchaser, its members, officers employees, agents, contractors or representatives or by any tests, studies or investigations pursuant to this Section 5.1 as are performed by Purchaser, its members, officers. employees, agents, contractors or representatives; provided, however, that Purchaser shall have no liability or indemnity obligations to the Seller under this Section 5.1 with respect to any pre-existing conditions on or about the Property.  Seller shall also not be responsible nor liable for any injury to Purchaser or its representatives who enter upon the Property to perform such engineering and other studies and tests.

5.2    Delivery of Seller's Property Documents.  Seller shall provide copies to Purchaser within fifteen (15) days of execution of this Agreement of all studies, plans, surveys and other documents in the possession of Seller pertaining to the Property (the "Materials").  Seller does not provide any representation or warranty with respect to the accuracy and completeness thereof.  Should this Agreement terminate for any reason, Purchaser shall (i) deliver to Seller, without charge, complete copies of any engineering and environmental reports or studies

prepared by or for Purchaser with regard to the Property and (ii) return to Seller the Materials previously delivered to Purchaser.

5.3     Delivery by Seller of Deed and Related Settlement Documents.  At or prior to Settlement, the Title Company shall prepare and Seller shall execute, acknowledge (as appropriate) and deliver to the Title Company, in escrow, the following:  (a) a quitclaim deed conveying title to the Property to Purchaser or its permitted assignee in the condition required by this Agreement; (b) a Combined Real Property Deed Recordation Tax and Real Property Transfer Tax Return (Form FP-7); (c) a Claim for Exemption from Real Property Recordation Tax or Real Property Transfer Tax (Form FP-5); (d) an owner's affidavit of title in the forms reasonably acceptable to Seller and Purchaser and the Title Company; (e) a settlement statement in accordance with the requirement of this Agreement and otherwise reasonably acceptable to Title Company, Seller and Purchaser; and (f) such additional documents as may be reasonably necessary or customary to consummate the transactions contemplated by this Agreement.

5.4     Permitted Title Exceptions.  The Property is hereby sold and will be conveyed subject to the following (collectively, "Permitted Title Exceptions"), and no others:

> (a)     reservations, restrictions and easements of record;

> (b)     applicable zoning regulations and ordinances;

> (c)     applicable federal, state and local environmental protection laws and regulations;

> (d)     real property taxes and assessments for the current tax period, if any;

> (e)     any condition or facts (including without limitation any unrecorded easements, discrepancies or conflicts in boundary lines, shortage in area or encroachments) that an accurate and complete survey of the Property would show and/or disclose;

> (f)     Purchaser's acceptance of any title exceptions with regard to any legal rights of former tenants of the Property under the Rental Housing Conversion and Sale Act of 1980, which acceptance must occur within thirty (30) days of the Effective Date of this Agreement; and

> (g)     the Return Option.

5.5     Removal of Liens.  Prior to Settlement, any and all mortgages, deeds of trust and other monetary liens encumbering all or any portion of the Property (other than the Permitted Title Exceptions) shall have been removed and released of record by Seller, or provision satisfactory to Purchaser (in its sole discretion) shall have been made by Seller for the full and complete release thereof such that the Title Company will issue an owner's policy of title insurance insuring title to the Property in the condition required by this Agreement; provided, however, that in no event shall Seller be obligated to spend in the aggregate more than Ten Thousand Dollars ($10,000.00) to remove any mortgages, deeds of trust or other liens encumbering the Property or any portion thereof; provided further, that in the event that Seller

shall decline to spend in the aggregate more than Ten Thousand Dollars ($10,000.00) to remove such encumbrances, Purchaser may elect in its sole and absolute discretion to terminate this Agreement, whereupon the Deposit shall be returned in full to Purchaser, and upon such return of the Deposit, the parties shall have no further rights, obligations or liabilities to each other hereunder, except for Purchaser's obligations and indemnifications contained in Section 5.1 above.

5.6    Default.  In the event Seller fails to perform any of its obligations under this Article V, Purchaser shall have all rights set forth in Sections 3.3(a) and 7.2.

## ARTICLE VI

### Settlement

6.1    Settlement; Settlement Costs.  Settlement shall take place in the office of the Title Company at 11:00 a.m. on the date scheduled for Settlement in accordance with Section 2.1 above. The Parties acknowledge that the time for settlement is a material term of this transaction. In the event that the Purchaser is not in default under the terms of this Agreement and the purchase of the Property by the Purchaser is delayed due to (i) the exercise of any claimed Refusal Option, or (ii) as a result of legal action by former tenants of the Property, or (iii) the imposition of a lien or other cloud on title to the Property (collectively, the "Settlement Delay"), the Seller shall grant an extension of the Settlement Date until the resolution of the Settlement Delay; provided, however, that such extension shall not be in excess of ninety (90) days. Thereafter, any additional extensions shall be at the mutual agreement of Seller and Purchaser. Immediately upon resolution of the Settlement Delay, if the Tenants' Organization fails to purchase the Property within the permitted time or if the legal action or other lien or cloud on title is dismissed, settled or resolved such that Seller can convey the Property to Purchaser pursuant to the provisions of this Agreement, Purchaser shall have forty-five (45) days to consummate the purchase of the Property.  Deposit with the Title Company of the Purchase Price, the deed of conveyance, and such other papers as are required by the terms hereof shall be deemed and construed as a good and sufficient tender of performance of the terms hereof. Recordation taxes, recording fees and other filing or similar fees and charges, survey costs, title insurance search costs and premiums, notary fees and other settlement costs, including all costs of financing, shall be paid by Purchaser.  Unless the conveyance of the Property is exempt therefrom, Seller shall pay the District of Columbia transfer tax.

6.2    Apportionment.  All real and personal property taxes, utility charges and other items customarily adjusted shall be apportioned between the Seller and Purchaser as of 11:59 p.m. on the day immediately preceding the Settlement Date.

6.3    Title Defects.  Purchaser's obligation to proceed to Settlement hereunder shall be contingent upon Purchaser being able to obtain from the Title Company, at Purchaser's sole cost and expense, a title policy insuring the title to the Property (other than personal property) in the condition required by this Agreement (including, without limitation, Sections 5.4 and 5.5 hereof).  Seller covenants not to make or consent to any changes to the title to the Property between the Effective Date and Settlement Date.  If the title commitment, as updated to and

marked up at Settlement, discloses any title defects other than the Permitted Title Exceptions, Purchaser shall have all rights set forth in Sections 3.3(a) and 7.2, subject, however, to the limitation on Seller's obligations set forth in Section 5.5.

## ARTICLE VII

## Default and Termination

7.1     Purchaser's Default.   If the transaction herein contemplated shall not be consummated on the Settlement Date because of Purchaser's default, then (i) Seller may terminate this Agreement on such date; (ii) Seller shall be entitled to receive and retain the Deposit, as liquidated damages, as Seller's sole and exclusive remedy; (iii) Seller shall have no further obligations hereunder and shall have no rights, claims, or remedies, including without limitation the remedy of specific performance or any other equitable remedy, against Purchaser, or any other person or persons, named or unnamed, disclosed or undisclosed, with or for whom Purchaser may be acting, for or based upon, Purchaser's default; (iv) Seller may enter into another contract for sale of the Property and Purchaser waives any right to contest such contract; and (v) Purchaser shall have no further rights or obligations hereunder, except for Purchaser's obligations and indemnifications contained in Section 5.1 above, and provisions of Sections 5.2 and 9.1. Any attendance or appearance at Settlement by either party shall not nullify or void this provision for alternative performance by payment of liquidated damages as Seller's sole and exclusive remedy.

7.2     Seller's Default. If the transaction herein contemplated shall not be consummated on the Settlement Date (as such date may be extended under the provisions of Section 6.1) because of Seller's default and/or a Settlement Delay (a Settlement Delay is not a Seller's default) which is not resolved within the ninety-day extension period so as to permit Purchaser to purchase the Property and Purchaser is not in default of its obligations under this Agreement, then Purchaser may elect in its sole and absolute discretion to (i) terminate this Agreement, whereupon the Deposit shall be returned in full to Purchaser, and upon such return of the Deposit, the parties shall have no further rights, obligations or liabilities to each other hereunder, except for Purchaser's obligations and indemnifications contained in Sections 2.3(d), 5.1 and 5.2 above and Section 9.1 below; or (ii) in the event of a Seller's default, sue for specific performance of the sale of the Property pursuant to this Agreement.  For purposes of Section 7.2(ii), the Authority expressly consents to jurisdiction and venue for such action in the United States District Court for the District of Columbia. In no event, however, shall Seller be liable to Purchaser for damages of any kind, including, but not limited to, actual, consequential or punitive damages, and Seller does not waive the provisions of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. 104-8, 109 STAT.97, as amended, including, but not limited to, Section 104 thereof.

## ARTICLE VIII

## Waiver

8.1     Waiver. Purchaser reserves the right (in its sole discretion) to waive, in whole or in part, any provision in this Agreement which is for the sole benefit of Purchaser.   Seller

reserves the right (in its sole discretion) to waive, in whole or in part, any provision in this Agreement which is for the sole benefit of Seller.

## ARTICLE IX

### Broker's Fees

9.1    Broker's Fees.  The Parties hereto represent and warrant to each other that there has been no broker, sales representative, finder, agent or anyone else involved in this transaction who would be entitled to a commission or other compensation on account of the sale of the Property from Seller to Purchaser.  Each Party agrees to and does hereby indemnify and hold the other harmless of and from any and all claims, damages, actions, or suites (including all court costs and reasonable attorneys' fees) arising out of or relating to any alleged agreement by such Party to pay a commission or other compensation to any broker, sales representative, finder, agent or anyone else in connection with this transaction.

## ARTICLE X

### Tax-Free Exchange Options

10.1    Generally.  Purchaser desires to structure the transaction contemplated by this Agreement so as to qualify as a tax-free exchange of like-kind property in compliance with the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended ("Section 1031"). Seller agrees to cooperate in all reasonable respects to allow Purchaser to structure the transaction contemplated by this Agreement to effect a like-kind exchange in compliance with the provisions of Section 1031 and the Regulations promulgated thereunder (the "Regulations"). Accordingly, Purchaser may enter into a written exchange agreement or assignment agreement at any time prior to Settlement with a "Qualified Intermediary" (as defined in Section 1.1031(k)-1(g)(4)(iii) of the Regulations) for the assignment of the rights of Purchaser under this Agreement to such Qualified Intermediary (an "Intermediary").  The Intermediary shall be designated in writing by Purchaser to Seller and Seller agrees that Seller shall sign and deliver to Purchaser a written instrument (to be prepared by Purchaser) solely acknowledging the designation of the Intermediary and the assignment of the right, title and interest of Purchaser under this Agreement to the Intermediary.  Upon designation of the Intermediary by Purchaser and upon the Intermediary's written assumption of the obligations of Purchaser hereunder, the Intermediary shall be substituted for Purchaser as the buyer under this Agreement.   The Intermediary shall be entitled to tender the entire Purchase Price to Seller and, in such event, notwithstanding the provisions of Section 2.2, the Deposit shall not be applied to the Purchase Price and shall be refunded to the Purchaser, or its designee, at Settlement.  Seller agrees in such case to convey title to the Property to the Intermediary (if Seller is so instructed by Purchaser and Intermediary) and to render Seller's performance of all of its obligations under this Agreement to the Intermediary.  Conveyance of title to the Property by Seller may be either (i) in the form of a deed to the Intermediary, as a qualified intermediary for Purchaser named herein, or (ii) in the form of a direct deed from Seller to Purchaser named herein, to be determined by Purchaser named herein, in Purchaser's sole discretion.

10.2    Terms, Provisions and Conditions.  The agreement of Seller to cooperate in all reasonable respects with Purchaser's efforts to structure the transaction contemplated by this Agreement as part of like-kind exchange under Section 1031 and the Regulations shall be subject to the following terms, provisions and conditions:

(a)    Settlement shall not be delayed as a result of any like-kind exchange aspects of the transaction.

(b)    If Purchaser is unsuccessful in its efforts to structure the transaction contemplated by this Agreement as part of a like-kind exchange, such occurrence shall not be deemed or construed as the failure of a condition precedent to Purchaser's obligations under this Agreement (including Purchaser's obligations to consummate the transaction contemplated herein); and in such case, Settlement shall proceed as if this Section were not included in this Agreement.

(c)    In no event shall Seller be obligated to take title to any other property of any nature or kind or to assume any other liability or exposure to facilitate Purchaser's like-kind exchange.  Purchaser shall pay and reimburse Seller for any and all costs and expenses (if any) incurred by Seller as a result of the election by Purchaser to structure Settlement as part of a like-kind exchange (but only to the extent such costs and expenses exceed the costs and expenses that otherwise would have been incurred by Seller under the other provisions of this Agreement). Furthermore, Purchaser shall defend, indemnify and hold Seller harmless from and against any and all damages, demands, claims, costs and expenses (including court costs and reasonable attorneys' fees and expenses) incurred by or asserted against Seller (or Purchaser) as a result of the election by Purchaser to structure Settlement as part of a like-kind exchange.

(d)    In no event shall Seller be required to enter into any contracts or agreements with any third parties as a part of Purchaser's like-kind, except for a written instrument acknowledging the designation of the Intermediary (as specifically provided above). The Intermediary shall be designated in writing by Purchaser to Seller not later than ten (10) days prior to Settlement.  Fully executed originals of all instruments between Purchaser and the Intermediary relating to the assignment by Purchaser to the Intermediary of the right, title and interest of Purchaser under this Agreement shall be delivered to Seller not later than ten (10) business days prior to Settlement.  In the event Purchaser designates a party or entity to serve as an Intermediary, Purchaser shall unconditionally guarantee the full and timely payment and/or performance by the Intermediary of each and every one of the representations, warranties, covenants, indemnities, obligations and undertakings (as the case may be) of the Intermediary (as the successor of Purchaser hereunder, by assignment) pursuant to this Agreement.  As such guarantor, Purchaser shall be treated as a primary obligor with respect to such representations, warranties, covenants, indemnities, obligations and undertakings (as the case may be); and, in the event of a breach by the Intermediary under this Agreement, Seller may proceed directly against Purchaser on the guarantee without the need to join the Intermediary as a party to the action. Purchaser unconditionally waives any defense that it might have as guarantor that it would not have if it had made or undertaken these representations, warranties, covenants, indemnities, obligations and undertakings (as the case may be) directly.

- 14 -

(e)    Seller shall not have any continuing or additional obligations after Settlement arising out of or relating to Purchaser's decision to structure the transaction contemplated by this Agreement as a like-kind exchange.

(f)    Regardless of whether Purchaser attempts to effect a Section 1031 deferred exchange, and regardless of whether any transaction effected by Purchaser in fact qualifies as a Section 1031 deferred exchange, Seller shall have no liability or obligation to Purchaser whatsoever by reason of this Article X provided Seller reasonably cooperates with Purchaser in connection with any attempted Section 1031 deferred exchange subject to the limitations provided in this Article X, regardless of any circumstances whatsoever relating to any attempted or completed Section 1031 deferred exchange by Purchaser, nor shall Seller have any liability to Purchaser for any tax or other consequences, losses, costs or damages whatsoever arising to Purchaser resulting from Seller's cooperation with Purchaser under this Article X or from any action taken by Purchaser in connection with any attempted Section 1031 deferred exchange by Purchaser.

(g)    The provisions of this Article X (except Seller's liability or obligation under subparagraph (f) above) shall survive the Settlement.

## ARTICLE XI

### General Provisions

11.1    Modifications and Waivers.  No modification, waiver, amendment, discharge or change of this Agreement, except as otherwise provided herein, shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.  This Agreement contains the entire agreement between the parties relating to the transactions contemplated hereby, and, unless specifically stated otherwise herein, all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged herein.

11.2    No Recordation.  This Agreement (or any memorandum thereof) shall not be recorded against the Property.

11.3    Successors and Assigns.  All terms of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, successors and assigns. Purchaser shall have the right to assign this Agreement and all of its rights and obligations hereunder to an entity related to or controlled by Purchaser or Purchaser's financing entity previously approved by Seller upon reasonable notice to Seller and otherwise upon written consent of Seller at its sole discretion.

11.4    Governing Law.  This Agreement is intended to be performed in the District of Columbia and shall be construed and enforced in accordance with the internal laws thereof, to the extent applicable to Seller.

11.5    Notices.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, or by

recognized air or overnight courier, or if sent by registered or certified mail, return receipt requested, and postage prepaid, to a party at its address set forth below, or at such other address as such party may specify from time to time by written notice to the other party:

If to Seller:

District of Columbia Financial Responsibility and Management Assistance Authority
One Thomas Circle NW, Suite 900
Washington, D.C. 20005
Attention: Executive Director

with a copy to:

Nixon Peabody LLP
1255 23rd Street, N.W.
Washington, D.C. 20037
Attention: Susan O. Cunningham, Esq.

If to Purchaser:

P and G, LLC
1520 16th Street, N.W., Unit 101
Washington, D.C. 20036
Attention: Giorgio Furioso, Manager Partner

with a copy to:

Lerner, Reed & McManus, LLP
815 Connecticut Avenue, N.W. Suite 900
Washington, D.C. 20006
Attention: Roger J. Lerner, Esq.

11.6    Exhibits.  All exhibits referred to herein and attached hereto are incorporated by reference into this Agreement.

11.7    Severability.  If any provision of this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions hereof and any other application thereof shall not in any way be affected or impaired, and such remaining provisions shall continue in full force and effect.

11.8    Construction.  Each party hereto and its counsel has reviewed and revised (or requested revisions of) this Agreement, and the normal rule of construction that any ambiguities

are to be resolved against the drafting party shall not be applicable in the construction and interpretation of this Agreement.

11.9   Time Periods.   Any time period hereunder which expires on, or any date hereunder which occurs on, a Saturday, Sunday or legal United States or District of Columbia holiday, shall be deemed to be postponed to the next business day.   The first day of any time period hereunder which runs "from" or "after" a given day shall be deemed to occur on the first business day subsequent to that given day.

11.10   Captions.   The captions of this Agreement are inserted for convenience of reference only and do not define, describe or limit the scope or the intent of this Agreement or any term hereof.

11.11   Counterparts.   This Agreement may be executed in any number of counterparts each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

11.12   Soil; Underground Storage Tanks; Lead-Based Paint.

(a)   Soil.   Seller advises Purchaser that the characteristics of the soil on the Property is Urban Land.   For further information, Purchaser can contact a soil testing laboratory, the D.C. Department of Consumer and Regulatory Affairs or the Soil Conservation Service (U.S.D.A.).   The foregoing does not constitute a representation or warranty by Seller as to soil characteristics or conditions.

(b)   Underground Storage Tanks.   The environmental report(s) listed on **Exhibit C** indicate the presence and/or use of an Underground Storage Tank on the Property. The foregoing does not constitute a representation or warranty as to the accuracy or completeness of the environmental report(s) listed on **Exhibit C**.

(c)   Lead-Based Paint.   The environmental report(s) listed on **Exhibit C** indicate the presence of Lead-Based Paint on the Property.   The foregoing does not constitute a representation or warranty as to the accuracy or completeness of the environmental report(s) listed on **Exhibit C**.   Seller has also given Purchaser the opportunity to conduct its own risk assessment or inspection.   By execution of this Agreement, Purchaser acknowledges receipt of the named documents and that it was given at least a 10-day period to conduct its own risk assessment or inspection of the Property.

11.13   Offer and Acceptance, Effective Date.   This Agreement has been executed first by Purchaser and shall be deemed a continuing and irrevocable offer of Purchaser to purchase the Property from the Seller, on the terms contained herein, after the date of Purchaser's execution until approval and execution of this Agreement by Seller pursuant to Section 203(b) of the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. 104-8.   Notwithstanding the foregoing, this Agreement shall be deemed a continuing and irrevocable offer of Purchaser to purchase the Property from Seller, on the terms contained herein, for a period of ten (10) business days after the approval and execution of this Agreement by Seller.

- 17 -

11.14  <u>Seller's Representatives Not Individually Liable</u>.  No member, official, agent or employee of Seller shall have any personal interest, direct or indirect, in this Agreement, nor shall any member, official, agent or employee participate in any decision relating to this Agreement which affects his or her personal interests or the interests of any corporation, limited liability company, partnership, joint venture, association, trust, or other entity in which he or she is, directly or indirectly, interested.  No member, official, agent or employee of Seller shall be personally liable to Purchaser, or any successor in interest, in the event of any default or breach by Seller or for any amount which may become due to Purchaser, or any successor in interest, or on any obligations under the terms of this Agreement or in any manner arising herefrom.

**[SIGNATURES BEGIN ON NEXT PAGE]**

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be to be executed as of the date indicated by their respective signatures below.

WITNESS

SELLER:

DISTRICT OF COLUMBIA FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE AUTHORITY

By: _____
    Alice Rivlin, Chair

Date: 5/19/00

By: _____
    Francis S. Smith, Executive Director

Date: 5/19/00

WITNESS

PURCHASER:

P AND G, LLC,
a District of Columbia limited liability company

By: _____
    Giorgio Furioso, its Managing Partner

Date: 5/14/00

- 19 -

## EXHIBIT A

All that certain lot or parcel of land situate and lying in the District of Columbia, and more particularly described as follows:

All of that (those) piece(s) and parcel(s) of land, including, but not limited to the appurtenances, rights of way and other hereditaments affecting the said piece(s) and parcel(s) of land, described as Lot 802 in Square 188 and also known as the Roosevelt Apartments.

[Note: Legal description to be copied from title commitment.]

**EXHIBIT B**

**ESCROW AGREEMENT**

[Note: Form of Escrow Agreement to be Supplied by Purchaser, and subject to Seller's approval.]

## EXHIBIT C

## LIST OF ENVIRONMENTAL REPORTS AND OTHER RELATED DOCUMENTS

1.    Phase I Environmental Site Assessment for The Roosevelt Building, Dated December 1999, prepared by Greenhorne & O'Mara, Inc.

2.    (Any environmental reports prepared for Purchaser.)

**EXHIBIT D**

**EXEMPTION**

EXHIBIT B

DESCRIPTION OF PROPERTY:

## DEVELOPMENT AND ASSIGNMENT AGREEMENT

*The Roosevelt*

THIS DEVELOPMENT AND ASSIGNMENT AGREEMENT (this "Agreement") is made as of this 30th day of June, 2000, by and between SUMMIT PROPERTIES PARTNERSHIP, L.P., a Delaware limited partnership ("Summit"), and P & G LLC, a District of Columbia limited liability company ("P & G") (Summit and P & G are sometimes individually referred to as a "Party" and collectively referred to as the "Parties").

WHEREAS, P & G and The District of Columbia Financial Responsibility and Management Assistance Authority ("Seller") have entered into an Agreement of Purchase and Sale, dated as of May 19, 2000 (the "Contract"), for the sale of that certain parcel of land, improved by a multi-storied hotel/apartment building, located at 2101 16th Street, N.W., Washington, D.C. and commonly known as "The Roosevelt" (the "Property"), which Property is more particularly described in Exhibit A attached hereto and incorporated herein by this reference. Summit desires to acquire the Property and develop the Property as residential apartments. P & G and Summit intend that the Property shall be acquired by Summit and developed by the Parties on the terms and conditions hereinafter set forth below;

NOW, THEREFORE, in consideration of Ten and No/100 Dollars ($10.00), the mutual promises and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     Assignment of Contract and Due Diligence Materials.  By a separate agreement to be executed concurrently with the execution of this Agreement (the "Assignment")(Attached hereto and incorporated herein as Exhibit B), P & G shall assign, and Summit shall assume, (i) all of P & G's interests, rights and obligations under the Contract and (ii) all of P & G's title to due diligence materials relating to the Property that were commissioned by P & G or are in the possession of P & G.  Pursuant to the terms of the Assignment and the intention of the Parties, the assignments and assumptions described above are conditioned upon the obligation of Summit to: (i) close under the Contract; and (ii) to close in escrow under that certain side letter to the contract from P & G and Summit to the Seller dated June 14, 2000 (the "Side Letter")(Attached hereto and incorporated herein as Exhibit C).  In the event that Summit shall fail to close, whether in escrow or finally, then the assignments and assumptions shall be null and void.

2.     Acquisition Price and Development Fee.    Summit shall be obligated to pay to P & G $2.5 million, payable to P & G as follows:

(a)     Upon the full execution of this Agreement Summit shall reimburse P & G for development expenses of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Acquisition Price"); and

(b) After execution and delivery of the Assignment by P & G to Summit, Summit shall pay $2.25 million (the "Development Fee") into escrow (the "Escrow"). The terms of the Escrow shall be governed by an Escrow Agreement in form and substance acceptable to Summit and P & G. Summit payment into the Escrow shall be in the form of an irrevocable letter of credit in the amount of $2.25 million (the "Letter of Credit"), payable to the escrow agent under the Escrow Agreement (the "Escrow Agent"), in accordance with the form of instructions attached hereto and incorporated herein as Exhibit B (the "Instructions"). The Letter of Credit shall be issued by a banking institution with assets of $10 billion or more, chartered under the laws of the United States or any state of the United States.

3.    Tenant Costs. All fees, costs and expenses, including but not limited to legal fees and expenses, settlement costs, court costs and judgments associated with the defense and attempted resolution of any and all claims of tenants, whether arising under the District of Columbia Rental Housing Conversion and Sale Act (the "Act") or under any other claim or cause of action, but excluding all costs related to Rent Control (as hereinafter defined), (the "Tenant Costs") in an amount up to and including $1 million ($1,000,000.00) shall be shared equally by the Parties. The payment of any Tenant Costs in excess of $1 million shall be the sole responsibility of Summit, but incurring Tenant Costs in excess of $1million shall be subject to Summit's sole discretion.

4.    Payment of Development Fee.

a.    The Development Fee, less P & G's share of the Tenant Costs, shall be paid to P & G upon: (i) recordation of a deed to the Property in accordance with paragraph 4 of the Side Letter; (ii) the recordation of a deed to the Property following the settlement of claims or counter claims asserted by the parties to the litigation styled *District of Columbia Financial Responsibility and Management Assistance Authority et al. v. Concerned Senior Citizens of the Roosevelt Tenant Association, Inc.* Case No: 00CV01416/ RCL United States District Court for the District of Columbia, or (iii) upon expiration of the statute of limitations for claims by tenants or former tenants of the Property under the Act and the transfer of title to the Property to Summit or its designee.

b.    P & G shall have the right, subject to the agreement of Summit, to direct the distribution of the Development Fee and shall bear all costs incurred as a result of its disbursement directions. The parties shall enter into a separate agreement or agreements as necessary to effectuate the distribution in a manner that P & G directs with the agreement of Summit, providing for payment of said Development Fee over a deferral period, and such separate agreements shall become a part of this Agreement as if fully written herein.

c.    Upon the occurrence of one of the event described is subparagraph 4(a) above, Summit shall pay to P & G $100,000 plus any interest earned thereon while in escrow, in addition to all other payments that may then be due.

0115076.05
LIB: C2

d.    In the event that the parties to Side Letter shall, in accordance with paragraph 5 thereof, terminate the Contract and the escrow provided for under the terms of the Side Letter, then the Escrow shall terminate and be released to Summit. In such event, all Tenant Costs shall be paid entirely by Summit and not split by the Parties as otherwise provided herein. Additionally, upon the release of all of the escrow provided for under the terms of the Side Letter, which shall also be released to Summit, Summit shall pay P & G $100,000, plus interest earned thereon while in escrow, in return of that portion of the deposit which P & G paid to the Seller in accordance with the Contract.

e.    If Summit shall: (i) fail for any other reason except for a default by Seller to close in escrow in accordance with the terms of the Side Letter, as the same may be modified, or provisions thereof waived, from time to time; or (ii) shall act to prevent the Escrow Agent from finalizing the settlement in accordance with paragraph 4 of the Side Letter, then P & G shall receive $2.5 million as its sole remedy and as liquidated damages for such failure and the parties shall be relieved of all other payment obligations under this Agreement, except that Summit shall hold P & G harmless form all Tenant Costs actually incurred. The liquidated damages shall be paid from: (i) the $250,000 in Acquisition Fee which Summit shall have paid to P & G in accordance with paragraph 2 hereof; and (ii) a distribution to P & G by the Escrow Agent of $2.25 million, plus any earnings thereon, from the Escrow, it being understood and agreed by the parties that the Escrow Agent shall have first caused the Letter of Credit to be fully drawn. The parties agree to assist and cooperate with the Escrow Agent in exercise of his duty to cause the Letter of Credit to be drawn in the event of a failure to settle by Summit as described above.

5.    <u>Closing</u>. Closing shall be contingent upon Seller's ability to deliver good title to the Property to Summit in accordance with the terms of the Contract as modified by the Side Letter.

6.    <u>Co-Developer</u>. P & G shall serve as co-developer, with Summit, of the Property. As such, P & G shall provide advice and counsel to Summit on issues relating to zoning, design and marketing of the Property, as well as with any other issues pertaining to, or involving negotiations or dealings with, the Seller, the District of Columbia and the surrounding community. In particular, P & G shall work toward resolving to Summit's satisfaction, all obligations, financial or otherwise, with respect to the issues relating to former tenant of the Property. The parties shall enter into a supplemental agreement, as referenced in subparagraph 4(b) and circumscribed by paragraph 4 as to scope and amount of consideration due P & G, to set the terms and compensation to P & G for its co-developer services, which shall be mutually acceptable.

7.    <u>Incentive Payment; Termination Payment; Preferred Return</u>.

a.    P & G shall be entitled to receive an annual incentive payment (the "<u>Incentive Payment</u>"), beginning on the first day of the calendar month following the earliest date by which both (a) substantial completion of the proposed renovations of the Property

3

by Summit and (b) ninety percent (90%) occupancy of the residential units of the Property by bona fide third-party tenants has occurred (the "Stabilization Date"). The Incentive payment shall be an amount equal to one and three-quarters percent (1.75%) of the gross revenue of the Property. The payment of the Incentive Payment shall be subordinated to Summit's receipt of a Ten Percent (10%) cumulative compounded annual return on its Investment (as hereinafter defined) in the Property ("Preferred Return"). In calculating the Preferred Return (i) the first annual period for the calculation shall begin on the date on which the certificate of occupancy for all of the Property shall be issued and end 12 months thereafter (the "First Annual Period"); (ii) cumulative compound return shall be calculated for the First Annual Period and each succeeding 12 month period thereafter; and (iii) the period prior to the First Annual Period shall not be considered in calculating cumulative compound return.

b.    For the purposes of this Agreement, "Investment" shall mean the sum of all actual costs incurred by Summit in connection with the acquisition, development and operation of the Property. Summit shall make available for inspection by P & G the income and expense statements used to calculate the operating revenue, Investment and Preferred Return. For purposes of the foregoing, operating expenses will be computed in accordance with Summit's existing practice for its other properties and reserves will be established in a manner consistent with Summit's practices for its other properties.

c.    For any year in which any portion of the Incentive Payment is subordinated and unpaid, such unpaid portion of the Incentive Payment will be payable without interest in the subsequent year or years so long as the Preferred Return has been paid. Deferred Incentive Payment(s) shall no longer be due or payable after such time as either party exercises a Termination (as hereinafter defined).

d.    In the event that the parties shall disagree as to the calculation of Preferred Return, Investment or operating income with respect to the Property, the parties shall attempt to resolve the matter through negotiation. In the event that the parties are unable to resolve their difference through negotiation, they shall each appoint a Certified Public Accountant (the "CPA") who shall meet to arbitrate the dispute. They shall do so in accordance with the terms of this agreement and generally accepted accounting procedures consistently applied. Should the parties' accountants be unable to resolve the dispute then they shall select a third CPA who shall resolve the matter. The decisions of the third CPA shall be final and shall asses costs, including the fees of all three CPAs, to the non-prevailing party.

8.    Termination. On and after the 36th month following the Stabilization Date, P & G shall have the right to require the purchase by Summit of P & G's interests in the Property and under this Agreement, and Summit shall have the right to purchase P & G's interests in the Property and under this Agreement (in either event, a "Termination"). The purchase price for such interests (the "Termination Payment") shall be an amount equal to ten times (10x) the cash due to P & G as Incentive Payments for the previous twelve (12)-month period, excluding any portion thereof which

4

had been deferred from any period prior to said twelve (12)-month period. In no event, however, shall the Termination Payment be less than $250,000.

9.     <u>Sale, Assignment prior to Termination Date</u>: Prior to a Termination, Summit may only sell, assign or transfer the Property or its rights and obligations under this Agreement, the Contract, the Side Letter, the Escrow Agreement, the Letter of Credit and all other agreements between the parties, or between and among the parties and the Authority. (the "Summit- P & G Agreements") if it causes the buyer, assignee or transferee, as the case may be, to assume all of its obligations to P & G under the Summit–P & G Agreements.  Summit further represents and warrants that it will not sell, assign or transfer the Property except to a party that is able to perform its obligations under the Summit-P & G Agreements.  Notwithstanding foregoing, the foregoing representation and warranty shall not apply if Summit is compelled by the Act to sell the Property to a tenants' organization.

10.     <u>Rent Control</u>.  Summit and P & G shall work together to resolve all issues arising from the application of District of Columbia's rent control laws, as set out in §§ 45-2501 et seq. of the D.C. Code ("Rent Control") to the Property.  Subject to its approval in advance and sole discretion, Summit shall pay up to and including $350,000.00 for costs, fees, expenses and settlements relating to Rent Control (the "Rent Control Costs").  Summit may elect to incur additional Rent Control Costs in its sole discretion.

11.     <u>Additional Assistance Fee</u>.  P & G shall be entitled to an additional fee of $250,000 if prior to a Termination it shall secure:  (i) the determination by the Rental Accommodations and Conversion Division ("RACD") and/or the Rental Housing Commission ("RHC") that the Roosevelt is exempt from Rent Control; (ii) the repeal, applicable to the Property, of Rent Control in the District of Columbia; or (iii) the execution of a 70% Voluntary Agreement, pursuant to D.C. Code §45-2525, (a "70% Agreement") by the Tenants Association and/or bona fide tenants (including without limitation those who have the right to return to the building per the RFO (as defined in the Contract), provided that such 70% Agreement is approved by the RACD, establishing rent ceilings binding upon all living units within the Property, averaging $4.50 per square foot and not less than $3.00 per square foot for any living unit, and also providing for consent of the signatories to condominium conversion language approving the conversion of the Roosevelt to condominiums pursuant to D.C. Code §§45-1601 et. seq.

12.     <u>Notices</u>.       Any notice, request, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be deemed to be delivered (a) upon receipt, if delivered by facsimile or if hand delivered, (b) on the first business day after having been delivered to a national overnight air courier service, or (c) three business days after deposit in registered or certified mail, return receipt requested, addressed as follows:

5

SUMMIT:

Summit Properties Partnership, L.P.
6500 Rock Spring Drive Suite 100
Bethesda, Maryland 20817
Attention: Thomas A. Baum
Telephone: (301) 530-8800
Facsimile: (301) 530-7636

with additional copies to:

David H. Jones, Esq.
Kennedy Covington Lobdell & Hickman, L.L.P.
Bank of America Corporate Center
100 N. Tryon Street, Suite 4200
Charlotte, North Carolina 28202
Telephone: (704) 331-7481
Facsimile: (704) 331-7598


P & G, LLC
c/o Furioso Development
1520 16th Street, NW, Unit 101,
Washington, DC 20036
Attention: Giorgio Furioso
Telephone: (202) 518-7888
Facsimile: (202) 518-7828

with additional copies to:

Roger J. Lerner, Esq.
Lerner, Reed & McManus, LLP
815 Connecticut Avenue, NW, #900
Washington, DC 20006
Telephone: (202) 835-1677
Facsimile: (202) 835-1870

13.    Assignment; Successors and Assigns.  This Agreement may be assigned, in whole or in part, by one party, only with the prior written consent of the other party (which consent shall not be unreasonably withheld), and shall be binding upon and shall inure to the benefit of any successors and assigns of the Parties.  Any assignment hereunder shall be in accordance with the provisions of paragraph 9 of this Agreement.

14.    Relationship of the Parties; Publicity.  Except as otherwise provided in this Agreement or any of the supplemental agreements hereto referred to herein, the relationship between the Parties is

6

contractual in nature and no partnership or joint venture between the Parties is created hereby. Furioso Development Corporation shall be recognized in all public announcements and press releases as a co-developer of the Property and shall be identified as a co-developer of the Property on any identification or site sign erected at the Property by Summit. The language, descriptions and layout used in any public announcement, press release or identification or site sign shall be determined by Summit in its sole discretion. Neither P & G nor Furioso Development Corporation nor any affiliated person or entity shall issue or authorize the issuance of any public announcement, advertisement or press release regarding the Property without Summit's consent in writing thereto.

15.     No Brokers.  The Parties each warrant and represent to each other that no realtor, broker, finder, or other intermediary has been involved with or employed by such party in connection with the transaction contemplated by this Agreement. The Parties agree to indemnify, hold harmless and defend the other from and against claims, loss, liability, cost and expense (including reasonable attorneys' fees at or before the trial level and any appellate proceedings) arising out of any claim made by any realtor, broker, finder, or other intermediary who claims to have been engaged, contracted or utilized by the indemnifying party in connection with the transaction which is the subject matter of this Agreement.

16.     Mutual Confidentiality.  Summit and P & G shall treat with utmost confidentiality all information furnished to each by the other either previously or in the future in any medium in which it is afforded access (collectively, the "Confidential Material"). The term "Confidential Material" does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by a Party or its representatives in violation of this agreement, (ii) is or becomes available to either Party on a non-confidential basis from a source other than the other Party, or (iii) was within a Party's possession prior to its being provided by the other Party or its representatives, or (iv) has been or hereafter is independently (without the use of any Confidential Material) acquired or developed by a Party without violation of any of obligation under this confidentiality agreement. Moreover, each Party further agrees to transmit the Confidential Material only to those of its representatives who need to know such information for the purpose of evaluating the transactions contemplated herein and who shall be advised by it of the restrictions imposed by this Agreement. Each Party will cause such representatives to comply with the provisions hereof and shall be responsible for any breach of this Agreement by its representatives. Notwithstanding the foregoing, if a Party or any of its representatives is required by law to disclose Confidential Material, the Party may make such disclosures and shall provide the other Party with prompt written notice thereof prior to disclosure, unless prohibited by law, so that the other Party may seek a protective order or other appropriate remedy, and the Parties shall cooperate with each other in obtaining the same.

17.     Survival.  All of the representations, warranties, covenants and agreements set forth in this Agreement shall survive until fully performed and shall not be deemed to terminate upon closing under this Agreement or closing under the Contract; *provided, however*, the obligations of Paragraph 16 above shall survive indefinitely.

18.     Entire Agreement.  This writing, the agreements referred to herein and the exhibits attached hereto constitute the entire agreement between the Parties relating to the development of the Property,

0115076.05
LIB: C2

and may not be modified, supplemented, discharged, or rescinded except by an instrument in writing executed by both Parties.

19.    Governing Law.    The Parties hereby agree that this Agreement and the transactions contemplated herein shall be governed by the laws of the District of Columbia.

20.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument.  In addition, the Parties may execute separate signature pages, and such signature pages (or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of both Parties.

## [SIGNATURES ON FOLLOWING PAGE]

0115076.05
LIB: C2

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**SUMMIT:**

SUMMIT PROPERTIES PARTNERSHIP, L.P.,
a Delaware limited partnership

By:     SUMMIT PROPERTIES INC.,
        a Maryland corporation,
        its sole general partner

        By:     _____

        Name: Thomas A. Baum
        Title:   Vice President


**P & G**:

P & G, LLC
a District of Columbia limited liability company,

By:     _____
        Name: _____
        Title: _____

9

## Exhibit A

Description of Property

# SUMMIT
P R O P E R T I E S

March 8, 2000

Mr. Giorgio Furioso
Furioso Development
1520 16th Street
Washington, DC 20006

Re:    The Roosevelt
       Washington, DC

Dear Giorgio,

This letter agreement sets forth the material terms and conditions upon which Summit Properties, Inc. ("Purchaser") and Furioso Development ("Furioso") are entering into a joint relationship as outlined below to effect the acquisition of the Roosevelt (the "Site") bounded by 16th Street, and V Street, NW, Washington, DC.

1.    Terms of Acquisition.    Furioso and the District of Columbia ("Seller") will enter into an agreement to acquire the site ("Contract"). Upon execution of the Contract, Furioso will assign to Purchaser, without recourse, its interests in the Contract to Purchaser or an entity formed by Purchaser, and all other due diligence materials relating to the Site in Furioso's possession.

The acquisition price ("Acquisition Price") for the assignment of a fully executed Contract shall be one half of the market value of the Historic Tax Credit, up to an amount of $2,500,000.00 (Two Million Five Hundred Thousand Dollars). Acquisition Price shall be payable in two parts; as a Development Fee as outlined in paragraph 5, with the balance payable at time of certification of the historic tax credit and resolution of tenants rights issues, drawn down by Furioso from a Letter of Credit or alternative financial instrument provided by Purchaser to be determined during Examination Period. All costs associated with providing and maintaining a Letter of Credit or alternative financial instrument shall be attributed to and deducted from the Acquisition Price. Additionally, all costs associated with satisfying the rights of existing tenants or tenant associations shall be attributable to and deducted from the Acquisition Price, up to an amount of $500,000 as per the following schedule: the first $250,000 of costs associated with the resolution of the tenants rights shall be deducted from the Acquisition Price; the second $250,000 of costs associated with the resolution of the tenants rights shall be payable by Purchaser; the next $500,000 of costs associated with the resolution of the tenants rights shall be split equally between Furioso and Purchaser. Costs associated with the resolution of the tenants rights beyond $1,000,000. shall be paid by Purchaser.

2.    Feasibility Study Period.    For the period of 90 days commencing from full execution of this letter agreement (the "Examination Period"), Purchaser, at its own cost, shall have the right to examine the Site and perform such due diligence as it deems necessary to confirm developability of the Site as a multi-family residential building with parking. Any soil studies or other studies of a physical nature shall be coordinated through Furioso. Purchaser shall indemnify Seller and Furioso against any claims, demands, losses, liability, and expense arising from or in connection with feasibility studies and shall produce such insurance coverage as required by the Contract. Unless Purchaser shall terminate the



*6500 Rock Spring Drive ♦ Suite 100*
*Bethesda, Maryland 20817*
*Telephone: (301) 530-8800*
*Facsimile: (301) 530-7636*
*www.summitproperties.com*

Mr. Giorgio Furioso
March 9, 2000.
Page 2

Agreement (defined below) on or before 5:00 pm on the last day of the Examination Period [whereupon the Initial Deposit (defined below) theretofore deposited by Purchaser will be refunded to Purchaser and Purchaser's rights, title, and interest, if any with respect to the Agreement, the Contract, Site and Company shall terminate automatically], Purchaser shall be deemed to have agreed to acquire the Site and engage Furioso on the terms and conditions of this letter agreement and the Deposit shall be non-refundable.

3.  Deposit. If the terms of the Letter of Acceptance prepared by the Seller require a refundable deposit to be posted ("Seller Deposit"), Purchaser shall post the Seller Deposit to supplement any deposits already posted by Furioso. Provided that Purchaser shall not terminate the Agreement by 5:00 pm on or before on the last day of the Examination Period, then the deposit shall become non-refundable and shall become applicable to the Purchase Price per the Contract with Seller. Should Purchaser terminate Agreement during the Examination Period but after such time that the contract with Seller requires Seller Deposit to become non-refundable, Furioso shall have 30 days to refund the Seller Deposit to Purchaser.

4.  Closing. Closing shall be contingent upon good and marketable title. Closing shall occur per the terms of the Contract to be negotiated with the Seller.

5.  Co-Venture Participants. Furioso will serve as a co-venture participant with Summit in the development of the project to assist with the development of the project, working on zoning, design and marketing issues, and other issues with the District and community. In particular, Furioso shall work toward relieving all financial obligations with respect to existing tenants of the Roosevelt. For performing these services and functions, Furioso shall be paid a development fee of $2,000,000.00 ("Development Fee"). Said fee shall be payable at Closing. In addition to the Acquisition Price, Furioso shall receive a 1.75% interest in both the total collections ("Incentive Payment") and the residual value of the property ("Termination Payment"), both subordinated to Summit receiving a 10% cumulative compounded unleveraged return on the property ("Preferred Return"). For any year in which Preferred Return is not achieved, Incentive Payment will be calculated and deferred, payable in the subsequent year or years in which the Preferred Return is achieved, up to the amount that total collections exceed the Preferred Return. However, deferred Incentive Payment(s) shall no longer be due or payable if at such time either party exercises Termination Payment as provided for under paragraph 6, and Preferred Return has not been achieved.

6.  Bridge Loan Financing. In the event that terms of the Contract shall require a Closing prior to the expiration of the Examination Period, Purchaser shall have the option of foregoing the remainder of the Examination Period and proceed with Closing. In lieu of this option, Purchaser shall agree to arrange to provide a Bridge Loan for a period of 9 months from March 15, 2000 to effect the purchase of the Site by Furioso. Terms of the Bridge Loan Financing to be included in the supplemental agreement as described in paragraph 8.

7.  Termination Payment. After 36 months from stabilization as defined by 90% occupancy, Furioso will have the right to require a purchase of its interest by Purchaser for a price of ten times (10x) the cash received under the Incentive Payment paid for the previous 12 months, excluding any portion thereof which had been deferred from any period prior to said 12 month period. In the event that no incentive payment is due, then the minimum Termination Payment shall be $500,000. Purchaser will have the right to purchase Furioso's interest under the same terms.

8.  Modification of Agreement. This letter shall be binding by both parties and their respective successors and assigns. Additionally, within ten (10) days of the date hereof, Purchaser shall deliver a draft supplement for Furioso to review and approve; such approval not to be unreasonably withheld. Supplement to cover such reasonable representations by the parties. The parties shall negotiate in good faith and execute such supplemental agreement prior to the expiration of the Examination Period. This letter agreement and supplement signed by both parties shall be deemed the "Agreement".



MAR-24-00 12:11 FROM:SUMMIT PROP BETHESDA    ID:3015307636    PAGE    4/4

Mr. Giorgio Furioso
March 9, 2000
Page 3

9. **Mutual Confidentiality.** The parties shall exercise mutual confidentiality regarding the terms of this letter agreement and the Agreement between Furioso and Purchaser.

10. **Broker.** Furioso and Purchaser each represent that no broker has been involved in this transaction.

11. **Miscellaneous.** This letter agreement shall be governed by and construed in accordance with the laws of the District of Columbia. This letter agreement shall constitute the entire Agreement of the parties with respect to the Site and relationship of the parties. This letter agreement may not be amended except in writing signed by both parties.

If the above terms meet with your approval, please execute as provided for below and return one copy to me.

Sincerely,

Thomas A. Baum
Senior Vice President

AGREED TO AND ACCEPTED BY:

Summit Properties Partnership, LP
By Summit Properties, Inc.

By: 

Thomas A. Baum
Senior Vice President

Date: 3/9/00

Witness:

Furioso Development

Giorgio Furioso    merge-part P&G LL.

Date: 3/8/00

Witness:



**The Parties**

2.      The Plaintiff, P & G, LLC (hereinafter "P & G"), is a District of Columbia limited liability company.

3.      The Plaintiff, Furioso Development Corporation (hereinafter "Furioso") is a District of Columbia corporation.

4.      The Defendant, Camden Summit Partnership, L.P. (hereinafter "Camden-Summit") is a Delaware limited partnership and was previously known as Summit Properties Partnership, L.P.

5.      The Defendant, Camden Summit, Inc., a Delaware corporation (hereafter "Camden"), is the general partner of Camden-Summit.

6.      Summit Properties, Inc., a Maryland corporation, was the original general partner of Defendant Camden-Summit.

7.      In 2005, Summit Properties, Inc. was merged with and into the Defendant Camden.

8.      Effective with the merger, the name of the partnership was changed to Camden Summit Partnership, L.P.

**Background**

9.      On May 19, 2000 P &G signed an Agreement of Purchase and Sale (the "Contract") with the District of Columbia Financial Responsibility and Management Assistance Authority to purchase the multi-storied hotel/apartment building located at 2101 16th Street, Northwest, Washington, D.C. and commonly known as "The Roosevelt" (the "Property").

2

10.    Previously on March 8, 2000, P & G and Camden-Summit had entered into a letter agreement (the "Letter Agreement") to set forth the material terms of a joint relationship to develop the Property. A copy of the Letter Agreement is attached hereto as Exhibit A.

11.    On June 30, 2000, in furtherance of the Letter Agreement, P &G and Camden-Summit entered into a Development and Assignment Agreement (the "Original Development Agreement") pursuant to which P &G was to assign all of its rights and obligations under the Contract to Camden-Summit. A copy of the Original Development Agreement is attached hereto as Exhibit B. The purchase price for the Contract included three payments:

    (a)    An "Acquisition Price" of $250,000.00 payable in cash upon execution of the Original Development Agreement to reimburse P & G for its prior development expenses;

    (b)    A "Development Fee" of $2.25 Million payable, upon execution and delivery of the assignment of the Contract, by letter of credit into an escrow account; and

    (c)    Continuing annual income payments from the Property equal to 1.75% of the gross revenue from the Property which were designated as "Incentive Payments".

12.    Pursuant to the Original Development Agreement, P & G and Camden-Summit executed an Assignment of Agreement of Purchase and Sale (the "Assignment") under which P & G assigned its rights in the Contract to Camden-Summit. A copy of the Assignment is attached hereto as Exhibit C.

13.    Prior to receipt of the Development Fee by P & G, Camden-Summit and P & G decided that they would amend the Original Development Agreement so that a portion of the Development Fee would be paid to P & G in limited partnership units in Camden-Summit. Therefore, on January 29, 2001 they entered into four new agreements (the "Four Agreements"):

3

a) a Development Agreement (the "Development Agreement"), b) a Contribution Agreement

(the "Contribution Agreement"), c) a Registration Rights and Lock-Up Agreement and d) a

Termination Agreement (the "Termination Agreement"). Copies of the Development Agreement,

Contribution Agreement and Termination Agreement are attached hereto as Exhibits D, E and F

respectively.

14.     Under the Development Agreement the Development Fee was reduced to

$350,000.00 and that amount, less certain expenses, was paid to P & G.  The requirement to pay

the Incentive Payments remained the same. Exhibit D ¶¶ 2(b), 7.

15.     Under the Contribution Agreement (Exhibit E) the remaining $1.9 Million of the

Development Fee was paid to P & G in the form of 66,376 limited partnership units in Camden-

Summit.

16.     The Termination Agreement (Exhibit F) terminated the Letter Agreement and the

Original Development Agreement.

17.     Pursuant to the Four Agreements and the Assignment, Summit-Camden acquired

title to the Property, developed it and is currently operating it.

### Count I
### Breach of Contract -- Termination Payment

18.     The allegations of paragraphs 1 through 17 are incorporated by reference.

19.     Under ¶ 8 of the Development Agreement, P & G has the right to require

Camden-Summit to purchase, and Camden-Summit has the right to require P & G to sell P & G's

interests in the Property on or after the 36th month following the Stabilization Date. Exhibit D at

3.

4

20.    The Development Agreement provides that the purchase price (the "Termination Payment") for Plaintiff's interest in the Property shall be "ten (10x) times the cash due to P & G as Incentive Payments for the previous twelve (12)-month period, excluding any portion thereof which had been deferred from any period prior to said twelve (12)- month period" with a minimum payment of $250,000.00. Exhibit D at 4.

21.    It was the intent of both P &G and Camden-Summit that the Termination Payment would be equal to approximately 1.75% of the then fair market value of the Property, being P & G's interest in the Property, and the parties estimated that this value would be approximately $1 Million.

22.    On or about October 3, 2006, P & G, through counsel, gave notice to the Defendants of the exercise of its right to require the purchase of its interest in the Property as provided in ¶ 8 of the Development Agreement.

23.    Upon information and belief, the Incentive Payments due for the twelve month period prior to the notice, i.e. October 2005 through September 2006 were approximately $89,754.16. Accordingly, P & G is entitled to ten times that amount - $897,541.60 – for its interest in the Property.

24.    The Defendants have refused to pay P & G the Termination Payment due under the Development Agreement.

25.    The Defendants are obligated to pay  P & G the Termination Payment as calculated pursuant to ¶ 8 of the Distribution Agreement. In the alternative, the Defendants are obligated to purchase P & G's 1.75% interest in the Property for its fair market value of approximately $1,225,000.00.

5

WHEREFORE, P & G demands judgment against the Defendants, Camden Summit Partnership, LP and Camden Summit, Inc., jointly and severally, in the amount of $897,541.60 or such other amount as is determined to be due as the Termination Payment or fair market value of P & G's interest in the Property, plus interest and costs.

### Count II
### Declaratory Judgment

26.    The allegations of paragraphs 1 through 25 are incorporated by reference.

27.    P & G has demanded that the Defendants pay the Termination Payment under ¶ 8 of the Development Agreement calculated as an amount equal to ten (10) times the Incentive Payments due for the twelve month period preceding the October 3, 2006 notice exercising termination rights.

28.    The Defendants dispute P & G's claim to a Termination Payment equal to ten (10) times the Incentive Payments due for the October 2005 through September 2006 time period. Defendants maintain that no Incentive Payments were due for that period and that P & G is entitled only to the minimum Termination Payment of $250,000 because payment of the Incentive Payments was deferred until Summit received a 10% compounded annual return on its investment.

29.    An actual controversy exists between the parties regarding the method of calculation of the Termination Payment under the Agreement, a difference in interpretation that entails a variance of approximately $630,000 in the amount of the payment due P & G.

WHEREFORE, P & G requests that the Court adjudge that the Termination Payment due P & G be calculated based upon the amount of the Incentive Payments due for the period

6

October 2005 through September 2006, whether or not payment is deferred and not actually paid, and that it be awarded costs.

## Count III
## Breach of Contract – Publicity

30.     The allegations of paragraphs 1 through 29 are incorporated by reference.

31.     ¶ 14 of the Development Agreement requires that the Plaintiff, Furioso Development Corporation "shall be recognized in all public announcements and press releases as co-developer of the Property and shall be identified as a co-developer on any identification or site sign erected at the Property by Camden-Summit." Exhibit D at 5.

32.     Furioso is a third party beneficiary of the Development Agreement and the requirement for identifying Furioso in connection with the Property was a material inducement for P & G to enter into the Development Agreement and assign the Contract to Camden-Summit.

33.     The Defendants have failed and refused to identify Furioso as the co-developer of the Property in publicity and signage.

34.     The Defendants' failure to identify Furioso as a co-developer has deprived it of valuable publicity to its economic detriment.

WHEREFORE, the Plaintiff, Furioso Development Corporation, demands judgment against the Defendants, Camden Summit Partnership, LP and Camden Summit, Inc., jointly and severally, in the amount of $100,000 plus interest and costs. Furioso further prays that the Defendants be ordered to identify Furioso Development Corporation as a co-developer of the Property in all existing or future public announcements regarding the property and site signs erected at the Property.

7

Respectfully submitted,

CONLON, FRANTZ, PHELAN & VARMA, LLP

David J. Frantz   #202853
Michael J. Conlon #215426
1818 N Street, N.W., Suite 400
Washington, DC  20036
Ph: (202)331-7050
Fax: (202) 331-9306
dfrantz@conlonfrantz.com

**Jury Demand**

The Plaintiffs demand a trial by jury of six (6).

David J. Frantz

8



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

P & G, LLC
Vs.                                                    C.A. No.        2007 CA 002922 B
CAMDEN SUMMIT PARTNERSHIP, L.P.

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued **by the judge** to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge MARY A TERRELL
Date:  April 25, 2007
Initial Conference: 9:15 am, Friday, July 27, 2007
Location:  Courtroom 219
              500 Indiana Avenue N.W.
              WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

CA Form 1

# Superior Court of the District of Columbia
## CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

| | |
|---|---|
| P&G, LLC and<br>FURIOSO DEVELOPMENT CORPORATION | 0002922-07 |
| *Plaintiff* | |

**VS.**

| | |
|---|---|
| CAMDEN SUMMIT PARTNERSHIP, L.P. and<br>CAMDEN SUMMIT, INC. | Civil Action No. _____ |
| *Defendant* | |

### SUMMONS

To the above named Defendant:   CAMDEN SUMMIT, INC., **SERVE:** CT Corporation System, 1025 Vermont Ave, NW, Washington, DC 20005

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| | |
|---|---|
| David J. Frantz & Michael J. Conlon | |
| Name of Plaintiff's Attorney | By _____ |
| 1818 N Street, N.W. - Suite 400 | Deputy Clerk |
| Address | |
| Washington, DC 20036 | |
| (202) 331-7050 | Date  4/25/07 |
| Telephone | |

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(6)-456/Mar. 91      **NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
04/30/2007
Log Number 512177486

**TO:**     Terry McKinney
         Camden Property Trust
         Three Greenway Plaza, Suite 1300
         Houston, TX, 77046

*Received
-TSMcKinney
5-2-07*

**RE:**     **Process Served in District of Columbia**

**FOR:**    Camden Summit, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | P & G, LLC and Furioso Development Corporation, Pltfs. vs. Camden Summit Partnership, L.P. and Camden Summit, Inc., Dfts. |
| **DOCUMENT(S) SERVED:** | Initial Order, Addendum, Summons, Complaint, Exhibits |
| **COURT/AGENCY:** | Superior Court - Civil Division, DC<br>Case # 0002922-07 |
| **NATURE OF ACTION:** | Breach of Contract and Declaratory Judgment |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/30/2007 postmarked on 04/26/2007 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | David J. Frantz<br>Conlon, Frantz, Phelan & Varma, LLP<br>1818 N Street, N.W.<br>Suite 400<br>Washington, DC, 20036<br>202-331-7050 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day, 798163753535<br>Email Notification, Terry McKinney TMCKINNEY@CAMDENLIVING.COM<br>Email Notification, Ann Prather aprather@camdenliving.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | C T Corporation System<br>Mark Diffenbaugh<br>1015 15th Street, N.W.<br>Suite 1000<br>Washington, DC, 20005<br>202-572-3133 |

Page 1 of  1 / MH

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of the package only, not of its contents.

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/15/2007
Log Number 512222984

**TO:**  Terry McKinney
Camden Property Trust
Three Greenway Plaza, Suite 1300
Houston, TX, 77046

**RE:**  **Process Served in District of Columbia**

**FOR:**  Camden Summit Partnership, L.P. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | P & G, LLC and Furioso Development Corporation, Pltfs. vs. Camden Summit Partnership, L.P. and Camden Summit, Inc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Initial Order, Addendum, Complaint, Exhibits |
| **COURT/AGENCY:** | Superior Court - Civil Division, DC
Case # 0002922-07 |
| **NATURE OF ACTION:** | Breach of Contract |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 05/15/2007 postmarked on 05/10/2007 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | David J. Frantz
Conlon, Frantz, Phelan & Varma, LLP
1818 N Street, N.W.
Suite 400
Washington, DC, 20036
202-331-7050 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day, 798675173159
Email Notification, Terry McKinney TMCKINNEY@CAMDENLIVING.COM
Email Notification, Ann Prather aprather@camdenliving.com |
| **SIGNED:**
**PER:**
**ADDRESS:** | C T Corporation System
Mark Diffenbaugh
1015 15th Street, N.W.
Suite 1000
Washington, DC, 20005 |
| **TELEPHONE:** | 202-572-3133 |

Page 1 of  1 / AS

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of the package only, not of its contents.

CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001  Telephone: 879-1133

| P & G, LLC and Furioso Development Corporation | |
|---|---|

*Plaintiff*

**VS.**

| CAMDEN SUMMIT PARTNERSHIP, L.P. and CAMDEN SUMMIT, INC. | |
|---|---|

*Defendant*

Civil Action No. 0002922-07

### ALIAS
### SUMMONS

To the above named Defendant: SERVE: CT Corporation System, Registered Agent for Camden Summit, Inc., 1015 – 15th Street, N.W., Suite 1000, Washington, DC 20005
You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| David J. Frantz & Michael J. Conlon |
|---|
Name of Plaintiff's Attorney

| 1818 N Street, N.W. - Suite 400 |
|---|
Address

| Washington, DC 20036 |
|---|

| 202 331-7050 |
|---|
Telephone

By _____
Deputy Clerk

Date May 9, 2007

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EL
DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPER NA
AVENUE, N.W., ROOM JM 170



Form CV(6)-454/Mar. 93

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

P & G, LLC
        Vs.                                    C.A. No.        2007 CA 002922 B
CAMDEN SUMMIT PARTNERSHIP, L.P.

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued **by the judge** to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge MARY A TERRELL
Date:  April 25, 2007
Initial Conference: 9:15 am, Friday, July 27, 2007
Location:  Courtroom 219
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC.  Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office.   The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

P & G, LLC                                    :
1613 16th Street, N.W.                        :
Unit 1                                        :
Washington, D.C. 20009                        :
                                              :
          and                                 :
                                              :
Furioso Development Corporation               :
1613 16th Street, N.W.                        :
Unit 1                                        :
Washington, D.C. 20009                        :
                                              :
          Plaintiffs                          :
                                              :               0002922-07
          v.                                  :
                                              :       Civil Action No. _____
Camden Summit Partnership, L.P.               :
212 S. Tryon St., Suite 500                   :
Charlotte, NC 28281                           :
                                              :
          and                                 :
                                              :
Camden Summit, Inc.                           :
3 Greenway Plaza, Suite 1300                  :
Houston, TX 77046                             :
                                              :
          Defendants                          :
                                              :
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

RECEIVED
Civil Clerk's Office
APR 2 5 2007
Superior Court of the
District of Columbia
Washington, D.C.

## COMPLAINT

The Plaintiffs, P & G, LLC and Furioso Development Corporation, for their Complaint

against the Defendants, Camden Summit Partnership, L.P. and Camden Summit, Inc., state as

follows:

1.      Jurisdiction of this Court is based upon D.C. Code § 11-921 (2006).

## The Parties

2.      The Plaintiff, P & G, LLC (hereinafter "P & G"), is a District of Columbia limited liability company.

3.      The Plaintiff, Furioso Development Corporation (hereinafter "Furioso") is a District of Columbia corporation.

4.      The Defendant, Camden Summit Partnership, L.P. (hereinafter "Camden-Summit") is a Delaware limited partnership and was previously known as Summit Properties Partnership, L.P.

5.      The Defendant, Camden Summit, Inc., a Delaware corporation (hereafter "Camden"), is the general partner of Camden-Summit.

6.      Summit Properties, Inc., a Maryland corporation, was the original general partner of Defendant Camden-Summit.

7.      In 2005, Summit Properties, Inc. was merged with and into the Defendant Camden.

8.      Effective with the merger, the name of the partnership was changed to Camden Summit Partnership, L.P.

## Background

9.      On May 19, 2000 P &G signed an Agreement of Purchase and Sale (the "Contract") with the District of Columbia Financial Responsibility and Management Assistance Authority to purchase the multi-storied hotel/apartment building located at 2101 16th Street, Northwest, Washington, D.C. and commonly known as "The Roosevelt" (the "Property").

2

10.     Previously on March 8, 2000, P & G and Camden-Summit had entered into a letter agreement (the "Letter Agreement") to set forth the material terms of a joint relationship to develop the Property. A copy of the Letter Agreement is attached hereto as Exhibit A.

11.     On June 30, 2000, in furtherance of the Letter Agreement, P &G and Camden-Summit entered into a Development and Assignment Agreement (the "Original Development Agreement") pursuant to which P &G was to assign all of its rights and obligations under the Contract to Camden-Summit. A copy of the Original Development Agreement is attached hereto as Exhibit B. The purchase price for the Contract included three payments:

(a)     An "Acquisition Price" of $250,000.00 payable in cash upon execution of the Original Development Agreement to reimburse P & G for its prior development expenses;

(b)     A "Development Fee" of $2.25 Million payable, upon execution and delivery of the assignment of the Contract, by letter of credit into an escrow account; and

(c)     Continuing annual income payments from the Property equal to 1.75% of the gross revenue from the Property which were designated as "Incentive Payments".

12.     Pursuant to the Original Development Agreement, P & G and Camden-Summit executed an Assignment of Agreement of Purchase and Sale (the "Assignment") under which P & G assigned its rights in the Contract to Camden-Summit. A copy of the Assignment is attached hereto as Exhibit C.

13.     Prior to receipt of the Development Fee by P & G, Camden-Summit and P & G decided that they would amend the Original Development Agreement so that a portion of the Development Fee would be paid to P & G in limited partnership units in Camden-Summit. Therefore, on January 29, 2001 they entered into four new agreements (the "Four Agreements"):

3

a) a Development Agreement (the "Development Agreement"), b) a Contribution Agreement (the "Contribution Agreement"), c) a Registration Rights and Lock-Up Agreement and d) a Termination Agreement (the "Termination Agreement"). Copies of the Development Agreement, Contribution Agreement and Termination Agreement are attached hereto as Exhibits D, E and F respectively.

14.    Under the Development Agreement the Development Fee was reduced to $350,000.00 and that amount, less certain expenses, was paid to P & G. The requirement to pay the Incentive Payments remained the same. Exhibit D ¶¶ 2(b), 7.

15.    Under the Contribution Agreement (Exhibit E) the remaining $1.9 Million of the Development Fee was paid to P & G in the form of 66,376 limited partnership units in Camden-Summit.

16.    The Termination Agreement (Exhibit F) terminated the Letter Agreement and the Original Development Agreement.

17.    Pursuant to the Four Agreements and the Assignment, Summit-Camden acquired title to the Property, developed it and is currently operating it.

## Count I
## Breach of Contract – Termination Payment

18.    The allegations of paragraphs 1 through 17 are incorporated by reference.

19.    Under ¶ 8 of the Development Agreement, P & G has the right to require Camden-Summit to purchase, and Camden-Summit has the right to require P & G to sell P & G's interests in the Property on or after the 36th month following the Stabilization Date. Exhibit D at 3.

20.    The Development Agreement provides that the purchase price (the "Termination Payment") for Plaintiff's interest in the Property shall be "ten (10x) times the cash due to P & G as Incentive Payments for the previous twelve (12)-month period, excluding any portion thereof which had been deferred from any period prior to said twelve (12)- month period" with a minimum payment of $250,000.00. Exhibit D at 4.

21.    It was the intent of both P &G and Camden-Summit that the Termination Payment would be equal to approximately 1.75% of the then fair market value of the Property, being P & G's interest in the Property, and the parties estimated that this value would be approximately $1 Million.

22.    On or about October 3, 2006, P & G, through counsel, gave notice to the Defendants of the exercise of its right to require the purchase of its interest in the Property as provided in ¶ 8 of the Development Agreement.

23.    Upon information and belief, the Incentive Payments due for the twelve month period prior to the notice, i.e. October 2005 through September 2006 were approximately $89,754.16. Accordingly, P & G is entitled to ten times that amount - $897,541.60 – for its interest in the Property.

24.    The Defendants have refused to pay P & G the Termination Payment due under the Development Agreement.

25.    The Defendants are obligated to pay  P & G the Termination Payment as calculated pursuant to ¶ 8 of the Distribution Agreement. In the alternative, the Defendants are obligated to purchase P & G's 1.75% interest in the Property for its fair market value of approximately $1,225,000.00.

WHEREFORE, P & G demands judgment against the Defendants, Camden Summit Partnership, LP and Camden Summit, Inc., jointly and severally, in the amount of $897,541.60 or such other amount as is determined to be due as the Termination Payment or fair market value of P & G's interest in the Property, plus interest and costs.

## Count II
### Declaratory Judgment

26.    The allegations of paragraphs 1 through 25 are incorporated by reference.

27.    P & G has demanded that the Defendants pay the Termination Payment under ¶ 8 of the Development Agreement calculated as an amount equal to ten (10) times the Incentive Payments due for the twelve month period preceding the October 3, 2006 notice exercising termination rights.

28.    The Defendants dispute P & G's claim to a Termination Payment equal to ten (10) times the Incentive Payments due for the October 2005 through September 2006 time period. Defendants maintain that no Incentive Payments were due for that period and that P & G is entitled only to the minimum Termination Payment of $250,000 because payment of the Incentive Payments was deferred until Summit received a 10% compounded annual return on its investment.

29.    An actual controversy exists between the parties regarding the method of calculation of the Termination Payment under the Agreement, a difference in interpretation that entails a variance of approximately $630,000 in the amount of the payment due P & G.

WHEREFORE, P & G requests that the Court adjudge that the Termination Payment due P & G be calculated based upon the amount of the Incentive Payments due for the period

6

October 2005 through September 2006, whether or not payment is deferred and not actually paid, and that it be awarded costs.

## Count III
### Breach of Contract – Publicity

30.    The allegations of paragraphs 1 through 29 are incorporated by reference.

31.    ¶ 14 of the Development Agreement requires that the Plaintiff, Furioso Development Corporation "shall be recognized in all public announcements and press releases as co-developer of the Property and shall be identified as a co-developer on any identification or site sign erected at the Property by Camden-Summit." Exhibit D at 5.

32.    Furioso is a third party beneficiary of the Development Agreement and the requirement for identifying Furioso in connection with the Property was a material inducement for P & G to enter into the Development Agreement and assign the Contract to Camden-Summit.

33.    The Defendants have failed and refused to identify Furioso as the co-developer of the Property in publicity and signage.

34.    The Defendants' failure to identify Furioso as a co-developer has deprived it of valuable publicity to its economic detriment.

WHEREFORE, the Plaintiff, Furioso Development Corporation, demands judgment against the Defendants, Camden Summit Partnership, LP and Camden Summit, Inc., jointly and severally, in the amount of $100,000 plus interest and costs. Furioso further prays that the Defendants be ordered to identify Furioso Development Corporation as a co-developer of the Property in all existing or future public announcements regarding the property and site signs erected at the Property.

7

Respectfully submitted,

CONLON, FRANTZ, PHELAN & VARMA, LLP

_____
David J. Frantz  #202853
Michael J. Conlon #215426
1818 N Street, N.W., Suite 400
Washington, DC  20036
Ph: (202)331-7050
Fax: (202) 331-9306
dfrantz@conlonfrantz.com


**Jury Demand**

The Plaintiffs demand a trial by jury of six (6).

_____
David J. Frantz

8