UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
                                  :

P & G, LLC et al                           :

        Plaintiffs                :

        v.                          :      Civil Action No. 1:07-cv-00929 JR

                                    :

Camden Summit Partnership, L.P. et al   :

        Defendants             :

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS I AND II OF THE COMPLAINT**

The Plaintiffs, P & G, LLC and Furioso Development Corporation, by counsel, submit this Memorandum of Points and Authorities in Opposition to the Defendants' Motion to Dismiss Counts I and II of the Complaint.

**Introduction**

This is an action to enforce the Plaintiffs' rights under a Development Agreement relating to the purchase of P & G, LLC's 1.75% interest in the Roosevelt apartment building (Counts I and II) and for breach of Furioso Development Corporation's publicity rights with respect to this property (Count III). The Defendants move to dismiss the Complaint relying upon an illogical and contorted interpretation of the parties' Agreement. The Defendants argue for a reading of the Agreement in a non-contextual manner which isolates two words, "cash due," and equates the Plaintiffs' right to payment of "ten (10x) times the cash due to P & G as Incentive Payments" to "ten times the cash paid". The Defendants erroneously assume that because the Incentive

1

Payments were subordinated and deferred, as provided in the Agreement, that the obligation was extinguished and not due. That is not what the Agreement says nor is it what the parties intended.

The Motion to Dismiss should be denied because 1) it relies upon allegations of disputed facts not found in the Complaint; 2) the Defendants' arguments rely upon the faulty premise that because payment of the Incentive Payments was subordinated and deferred that there was no "cash due to P & G as Incentive Payments"; and 3) the Defendants' interpretation of the Agreement effectively nullifies the terms of the Termination Payment provision.

### Legal Standard for a Rule 12(b)(6) Motion to Dismiss

A motion to dismiss a complaint pursuant to Rule 12(b)(6) may only be granted where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The complaint must be viewed in the light most favorable to the plaintiff, and, in considering the allegations of the complaint, the plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994) (internal quotations omitted). The factual allegations of the complaint must be accepted as true and liberally construed in favor of the plaintiff. And, "In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-625 (D.C.Cir. 1997).

### Defendants Motion to Dismiss Improperly Relies Upon Disputed Facts Not Found in the Complaint

Defendants' Motion to Dismiss is patently defective because it is grounded on disputed factual allegations that are not pled in the Complaint. Indeed, the Defendants rely upon

2

allegations of fact that are in direct conflict with the allegations of the Complaint. For example,
the Defendants assert that:

> The Roosevelt investment proved to be less profitable than the parties had hoped and
> Camden Summit was never able to achieve the Preferred Return. *Accordingly, no
> Incentive Payment ever became due to P&G under the Agreement.* These facts are
> undisputed. (emphasis added)
>
> ...
>
> At the time of termination, no Incentive Payments were "due" to P&G for the previous
> twelve month period because Camden Summit had not realized the Preferred Return.

Motion to Dismiss at 4. Defendants further allege that "It is undisputed that Camden Summit

never received this Preferred Return, just as it is undisputed that P&G never became entitled to

the Incentive Payments." *Id.* at 7. This is the crux of the Defendants' argument, yet it ignores

allegations of the Complaint which state the exact opposite:

> 23.    Upon information and belief, *the Incentive Payments due for the twelve month
> period prior to the notice, i.e. October 2005 through September 2006 were approximately
> $89,754.16.* Accordingly, P & G is entitled to ten times that amount - $897,541.60 – for
> its interest in the Property. (emphasis added)
>
> ...
>
> 27.    P & G has demanded that the Defendants pay the Termination Payment under ¶ 8
> of the Development Agreement calculated as an amount equal to ten (10) times the
> Incentive Payments due for the twelve month period preceding the October 3, 2006
> notice exercising termination rights.

Complaint ¶¶ 23, 27. And, Count II for declaratory relief identifies the dispute between the

parties over the amount of the Termination Payment as being the controversy over whether

Incentive Payments were due for the October 2005 through September 2006 time period.

Complaint ¶ 28.

Defendants realize that they can prevail only if Incentive Payments to P& G were not

due, so they reach outside of the Complaint and make factual allegations in their Motion that are

both disputed and absent from the Complaint. The Defendants allege that "no Incentive Payment

3

ever became due to P&G under the Agreement". The Complaint states that Incentive Payments were due. The Defendants allege that "Camden Summit was never able to achieve the Preferred Return." The Complaint makes no such allegation or admission, and, if asked in discovery, the Plaintiffs would dispute that allegation. The Defendants allege that "The Roosevelt investment proved to be less profitable than the parties had hoped". The Complaint makes no such allegation or admission, and, if asked in discovery, the Plaintiffs would dispute that allegation. Thus, the Defendants' Motion is defective because it does not accept as true all factual allegations of the Complaint much less all reasonable inferences from these allegations. Indeed, the Defendants rely upon allegations that are in conflict with those of the Complaint. A Motion to Dismiss under Rule 12(b)(6) cannot be granted on that basis. *See EEOC v. St. Francis Xavier Parochial Sch.*, *supra*.

### The Defendants Misinterpret the Termination Payment Provision by Equating Subordination and Deferral of the Incentive Payments with Extinguishment of the Obligation

While the Defendants' violation of the ground rules for a Rule 12(b)(6) motion requires denial of the motion outright, the Plaintiffs will respond to the Defendants' arguments which set forth their current interpretation of the Development Agreement.

Defendants attack the Complaint and allege obfuscation because of its references to "Incentive Payments due" rather than the entire clause from the Termination Payment section, "ten (10x) times the cash due to P & G as Incentive Payments." While it is true that the Complaint does at times use the abbreviated reference to "Incentive Payments due," it also fully quotes the terms of the Termination Payment section and Plaintiffs attached the Agreement as Exhibit D to the Complaint. *See* Complaint ¶ 20. References to "Incentive Payments due" are a

4

substitute for "cash due to P & G as Incentive Payments" – certainly a reasonable inference from the Complaint's allegations.

It is the Defendants who engage in mischief in their interpretation of the terms of the Development Agreement. Defendants would revise the Agreement's reference to "cash due...as Incentive Payments" to read "cash paid... as Incentive Payments". The Agreement provides that "P & G shall be entitled to receive an annual incentive payment" of 1.75% of the gross revenue after substantial completion and 90% occupancy of the Property, the "Stabilization Date."[1] Exhibit D ¶ 7 at 2-3. However, *payment* of the Incentive Payments was *subordinated* to Camden Summit's receipt of a 10% cumulative return. *Id.* The debt for the Incentive Payments existed once the Stabilization Date was achieved. That payment was subordinated to Camden Summit's receipt of a 10% return does not extinguish the obligation.

The Defendants' argument that "subordinated payments do not involve 'cash due'" is wrong. Motion at 9. Even if Camden Summit's obligation to make the payments was subordinated and deferred, there was a debt which was due. The Defendants assume that since the Incentive Payments were subordinated to the Preferred Return, and if the Preferred Return was not paid, then no Incentive Payments were "due". However, the assumption is incorrect because subordination does not serve to extinguish subordinated debt, it merely gives unsubordinated debt priority over subordinated debts. The Development Agreement clearly contemplates that, in the event the Preferred Return is not paid, the Incentive Payments should be subordinated and merely deferred, not extinguished or be no longer payable. This is evidenced by ¶ 7(c) of the Development Agreement, which states that for any year in which any portion of the Incentive Payment is subordinated and unpaid, such unpaid portion of the Incentive Payment

---

[1] Defendants do not dispute that these conditions were satisfied and that the Stabilization Date was achieved.

will be payable without interest in the subsequent year or years so long as the Preferred Return

has been paid. It is apparent from ¶ 7 of the Development Agreement that, while Incentive

Payments may be deferred and become payable at a later date, the deferral of the obligation to

pay Incentive Payments does not extinguish the obligation to pay them at a future time.

The Defendants' reliance upon dictionary definitions of select words "cash" and "due"

removed from the full context of the parties' agreement is overly simplistic and misleading. The

meaning of these words must be ascertained based upon a reading of the Agreement as a whole

"so as to give meaning to all of the [contract's] express terms." *Ameren Servs. Co. v. FERC*, 330

F.3d 494, 499 (D.C. Cir. 2003). In *In re Vause,* 886 F.2d 794 (6th Cir. 1989), the Sixth Circuit

held that the word "due" is inherently ambiguous and criticized the use of dictionary definitions

as the Defendants do in their motion here. The Court said that "Reliance on a comparison of the

definitions of 'due' and 'accrued' in *Black's* neglects that"

> Due has many definitions, or a variety of meanings, . . . *no general rule of*
> *interpretation can be safely stated therefrom.* It may, on the one hand, express the
> mere fact, or the state, of indebtment, as an equivalent simply of "owing;" or, on
> the other hand, it may refer to the time of payment, indicating that the obligation
> is immediately enforceable . . . . It has been said that there is a practical, if not a
> theoretical, unanimity of judicial opinion in giving to the word this double
> meaning.

*Id.* at 800 (*quoting* 28 C.J.S. *Due* 72 (1941)) (footnote omitted). The Court

further cautioned that

> One piece of sound advice in *Black's Law Dictionary* that we do accept is that, "there is
> considerable ambiguity in the use of the term ["due"], the precise signification being
> determined in each case *from the context." Black's Law Dictionary* 448 (5th ed. 1979)
> (emphasis added). The context in this case does not lend itself to a "plain meaning"
> analysis.

*Id. See also Edelen v. First Nat'l Bank,* 115 A. 602, 603 (Md. 1921) ("The meaning of the word

'due' depends, of course, upon the connection in which it is used.").

While the Plaintiffs maintain that the meaning of "cash due to P & G as Incentive Payments for the previous twelve (12) month period" is clear when read in the context of the Development Agreement – that cash was due for Incentive Payments the payment of which was subordinated and deferred – if as this case unfolds there is a genuine issue of fact regarding the meaning of the Agreement, then parol evidence is admissible to establish the parties' intent at the time of the execution of the Agreement. "A contract should be read so as to honor the intent of what a reasonable person, in the position of the parties at the time the contract was executed, would have thought." *Sapiro v. VeriSign*, 310 F.Supp.2d 208, 213 (D.D.C. 2004); *see Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C. 2002). In *Insurance Management of Washington, Inc. v. Guthrie,* 310 A.2d 61 (D.C. 1973), the D.C. Court of Appeals held that it was appropriate for the trial court to admit parol evidence to resolve ambiguity and determine the meaning of the words "debit" and "due and owing" in a statement of account signed by the defendant: "The record justifies the admission of Guthrie's [defendant's] testimony pertaining to the discussions with Matternas over the meaning of the words 'debit' and 'due and owing' as used in the statement of account. Parol evidence was properly allowed because the context in which the language was used revealed ambiguity." 310 A.2d at 63 (citation omitted). If there is a genuine issue here in determining whether there was "cash due to P & G as Incentive Payments" at the time of termination, then parol evidence may also be appropriate to determine the intent of the parties.

**Defendants' Interpretation of the Termination Provision Nullifies its Terms**

Defendants' tortured reading of the Development Agreement reaches its zenith in

7

their fanciful interpretation of the language excluding previous years' Incentive Payments from the calculation of the Termination Payment pursuant to ¶ 8 of the Development Agreement. Motion to Dismiss at 9 – 10. The Termination Payment section states:

> The purchase price for such interests (the "<u>Termination Payment</u>") shall be an amount equal to ten times (10x) the cash due to P & G as Incentive Payments for the previous twelve (12)-month period, excluding any portion thereof which had been deferred from any period prior to said twelve (12)-month period.

Exhibit D ¶ 8 at 3 – 4.

The plain meaning of that language is to exclude payments which had become due for previous years but had not been paid and to base the Termination Payment solely on those payments which were due for the previous twelve months. This makes sense. If the calculation of the Payment included all payments which were still due, even if for just one month in the past, the Termination Payment, which was designed to be the capitalization of P & G's 1.75% interest, would not equal the real value of that interest based on the gross revenue of the building.

Defendants attempt to discredit this plain meaning by hypothesizing that something is "due" at only one instant in time and does not remain "due" even though it was not paid. They argue that the exclusory language in the second part of the above sentence would be unnecessary if it applies to amounts "due" because it equates "due" with "accrue" rather than "owing" and postulate that something can only accrue at one point in time. Therefore, if something "became due" in an earlier twelve month period it would not still be "due" in the twelve month period used to calculate the Termination Payment and there would be no need for the exclusory language.

This argument defies reason. While an amount may "accrue" or "become due" at a particular point in time, it remains "accrued" or "due" until it is paid. The entitlement to the

8

amount does not expire but remains in effect. Therefore, all unpaid amounts "due... as Incentive Payments" from previous years would continue to be accrued and continue to remain due until paid, and the language calculating the Termination Payment had to exclude them in order to properly capitalize P & G's interest in the property.

Defendants claim that the language makes more sense if the Termination Payment was to be based on the amounts which are "presently owed", by which they mean "payable because the Preferred Return had been met". Therefore, they claim that since amounts could be payable from prior years those amounts had to be excluded. But this interpretation also leads to absurd results. It only works if the Termination is elected <u>prior to the time any Incentive Payments have been made.</u> At that point no payments would have been made for the previous twelve months (or for earlier periods) and therefore would still be "payable because the Preferred Return had been met". A calculation at that singular point in time at least would make Defendants' interpretation plausible.

However, once the Preferred Return was achieved, P & G was immediately entitled to payment of all past and present Incentive Payments. Exhibit D ¶ 7(c) It would have rightly demanded this payment and the time period when the payments were "payable because the Preferred Return had been met" would have been very short. Using Defendants' definition of "due", if P & G had exercised its Termination right immediately after all current and back Incentive Payments had been paid, because no Incentive Payments were then payable, it would only be entitled to the minimum payment of $250,000.00. This makes the Termination Payment dependent solely on the timing of the Termination election rather than the value of P & G's interest or the economics of the property, a result which is patently unreasonable.

9

The same illogical result would be true if the Agreement had not required deferral of the Incentive Payments because of the Preferred Return or if in fact the Preferred Return is achieved so that Incentive Payments may be made as they become due. Incentive payments are to be calculated and paid annually. Therefore, no amount is "payable" until the year ends and the gross revenue can be calculated. Using Defendants' definition, an Incentive Payment is only "payable" for the short period of time between the end of the year and the time the Incentive Payment is paid to P & G. Therefore, even though the property would continue to generate gross revenue which would be used to determine the Incentive Payment due at the end of that year, P & G would only be entitled to the $250,000 minimum payment because no Incentive Payment would then payable. This would effectively nullify all of the Termination provision except the minimum payment clause.

Moreover, because Defendants also have a right under ¶ 8 to exercise the Termination option, if their interpretation is correct and "due" means "payable because the Preferred Return has been met", they could have timed their exercise so that only the minimum payment would be due, even though Incentive Payments were paid for the previous year and might be due at the end of the current year. Doing so would effectively deprive P & G of the payment for which it had bargained.

### Payment of the Termination Payment as Calculated by Plaintiffs Does Not Result in Any Windfall Profit to P & G

Defendants also contend that the payment to P & G of ten times the 1.75% Incentive Payments which were due but unpaid for the prior twelve months would result in an "economic windfall" to P & G. It is very difficult to understand what basis Defendants have for reaching

10

such a conclusion because there is nothing in the Complaint or in the Development Agreement itself which alleges the parties' intent in determining the overall price which Defendants' predecessor, Summit, was to pay to P & G. Therefore, this argument is mere speculation and cannot be considered in the context of this Motion.

Moreover, it is speculation constructed on other speculation. As stated previously, ¶ 8 of the Development Agreement does not mention the Preferred Return. It speaks solely of determining the Termination Payment based on a capitalization of the Incentive Payments. Since there is no mention of the Preferred Return in that paragraph there is no basis for the argument that it must be considered when determining the Termination Payment. Had the parties to the Agreement desired to limit the amount of the Termination Payment based on the failure to achieve the Preferred Return they would have said so in ¶ 8. They did not and therefore Defendants' contention that the Preferred Return had to be achieved before any Incentive Payments due or even accrued could be used to determine the Termination Payment is also speculation.

The argument also flies in the face of ¶ 21 of the Complaint which states that "It was the intent of both P & G and Camden-Summit that the Termination Payment would be equal to approximately 1.75% of the then fair market value of the Property." There is nothing in this allegation about discounting such valuation based on risk, the Preferred Return or any other condition. Since for purposes of this Motion such statement must be accepted as true, then Defendants are compelled to accept that statement as true and cannot argue that the valuation can be discounted.

However, Defendants' argument also fails logically. The essence of their argument is that because P & G did not receive actual payment of the Incentive Payments that this somehow

11

reduces its economic interest in the Property. This argument simply ignores the common reality

that for many corporations, partnerships and limited liability companies the owners' percentage

interests in the event of sale of the entity that it owns often varies from the owners' percentage

interests in the income of the entity. There is no rule which dictates that receipt or non-receipt of

income from a property determines the economic interest of a party in that property, and there is

certainly nothing in the Development Agreement which would support such an argument.

Finally, Defendants' argument also assumes that the Incentive Payments to P & G will

never be paid, i.e., P & G will never derive any income from the Property. First, this assumes

facts not before the Court with respect to whether or not the Preferred Return has been achieved

and when and if actual payments of the Incentive Payments to P & G will be made. For purposes

of this Motion, it cannot be assumed that those payments will not be made at some point in the

future. In fact it is likely that they will be paid. Even if Defendants have not yet achieved the

Preferred Return out of the cash flow from the property, a fact which Plaintiffs dispute, there is

no reason to believe that they will not do so in the future. But even if for purposes of argument, it

is assumed that the cash flow from the property will never be sufficient to allow the Defendants

to achieve their full Preferred Return, when the property is sold, the sales price will almost

certainly provide Defendants with their Preferred Return and the Incentive Payments would be

due at the time of the sale. Therefore, P & G is likely to receive those payments in the future and

the valuation of its interest for purposes of determining the Termination Payment should not be

discounted merely because they have not yet been received.

Finally, the Termination Payment is the method that the parties selected to allow P & G

to realize the current value of its accrued Incentive Payments, especially if those payments were

not being made. This would allow it to "cash out" its interest rather than wait until a future time

for payment of the Incentive Payments. This "cash out" option is confirmed by ¶ 7(c) of the Agreement which provides that "Deferred Incentive Payment(s) shall no longer be due or payable after such time as either party exercises a Termination (as hereafter defined)." Thus P & G had a choice, it could either continue to receive Incentive Payments for its 1.75% interest in the property (or continue to have such Payments deferred until the Preferred Return was achieved) or it could elect to receive the Termination Payment in lieu of those Payments and give up its right to all past unpaid Payments and all future Payments. Therefore to assert that P & G was only entitled to receive a minimum rather than a calculated Termination Payment when Incentive Payments remain unpaid, deprives it of the ability to "cash out" its interest when it is not receiving the Incentive Payments it expected.

**Conclusion**

For these reasons, the Plaintiffs respectfully request that the Motion to Dismiss pursuant to Rule 12(b)(6) be denied.

Respectfully submitted,

CONLON, FRANTZ, PHELAN & VARMA, LLP

David J. Frantz   #202853
Michael J. Conlon #215426
1818 N Street, N.W., Suite 400
Washington, DC  20036
Ph: (202)331-7050
Fax: (202) 331-9306
dfrantz@conlonfrantz.com

Counsel for Plaintiffs

13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
                                              :
P & G, LLC et al                              :
                                              :
            Plaintiffs                        :
                                              :
    v.                                        :       Civil Action No. 1:07-cv-00929 JR
                                              :
Camden Summit Partnership, L.P. et al         :
                                              :
            Defendants                        :
                                              :
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**ORDER**

This matter is before the Court on the Defendants' Motion to Dismiss Counts I and II of

the Complaint and the Plaintiffs' Opposition thereto. Upon consideration thereof and it appearing

that the Counts I and II state claims upon which relief can be granted, it is hereby

**ORDERED** that the Motion to Dismiss Counts I and II of the Complaint be and hereby is

denied.


                                              _____
                                              James Robertson
                                              United States District Judge

Date: _____